ENTERGY GULF STATES,
INC., Petitioner,

v.

John SUMMERS, Respondent.

No. 05–0272.

Supreme Court of Texas.

Argued Oct. 16, 2008.

Decided April 3, 2009.

Rehearing Denied June 5, 2009.

**434** 

Christine S. Kibbe, Paul A. Scheurich, Entergy Services, Inc., Beaumont TX, Jacqueline M. Stroh, Sharon E. Callaway, Crofts & Callaway, P.C., San Antonio TX, for Petitioner.

Steven C. Barkley, Law Office of Steven C. Barkley, Beaumont, TX, Collyn A. Peddie, Williams Kherkher Hart Boundas, LLP, Houston TX, for Respondent.

George S. Christian, Texas Civil Justice League, Jay Harvey, Winckler & Harvey, L.L.P., Austin, TX, Peter M. Kelly, Law Office of Peter M. Kelly, P.C., Houston, TX, Guy D. Choate, Webb, Stokes & Sparks, L.L.P., San Angelo, TX, Zoe Emily Taylor, Texas Trial Lawyers Ass'n., Austin, TX, A. Craig Eiland, A. Craig Eiland Attorney At Law PC, Galveston, TX, Steven Greene Bresnen, Richard Levy, Deats Durst Owen & Levy, PLLC, Austin, TX, James Underwood, Waco, TX, Robert L. Looney, E. Lee Parsley, E. Lee Parsley, P.C., Austin, TX, Christina Stone, Gaughan Stone & Thiagarajan, Houston, TX, Scott P. Stolley, Thompson & knight LLP, Dallas, TX, for Amicus Curiae.

Justice GREEN delivered the opinion of the Court, in which Justice WAINWRIGHT and Justice BRISTER joined, and in Parts I, II, III, IV, V, VI, VIII and IX of which Justice HECHT joined, and in Parts I, II, III, IV, V, VI, VII, and IX of which Justice JOHNSON joined, and in Parts I, II, III, VI, VII, and IX of which Justice WILLETT joined.

Rehearing was granted in this case and our previous opinion was withdrawn. We now substitute the following in its place. The judgment remains unchanged.

In this workers' compensation case, we decide whether a premises owner that contracts for the performance of work on its premises, and provides workers' compensation insurance to the contractor's employees pursuant to that contract, is entitled to the benefit of the exclusive remedy defense generally afforded only to employers by the Texas Workers' Compensation Act. While the Act specifically confers statutory employer status on general contractors who qualify by providing workers' compensation insurance for their subcontractors' employees, it says nothing about whether premises owners who act as their own general contractor are also entitled to employer status, and thus the exclusive remedy defense. We hold that the exclusive remedy defense for qualifying general contractors is, likewise, available to premises owners who meet the Act's definition of "general contractor," and who also provide workers' compensation insurance to lower-tier subcontractors' employees. Because we conclude that Entergy Gulf States, Inc. meets the definition of "general contractor" under the Act, and because Entergy otherwise qualifies under the Act as having provided workers' compensation insurance under its written agreement with International Maintenance Corporation (IMC), it is entitled to the exclusive remedy defense against the negligence claims brought by IMC's employee, John Summers. We reverse the court of appeals' judgment and render judgment for Entergy.

I

Entergy contracted with IMC to assist in the performance of certain maintenance, repair and other technical services at its

various facilities. The parties agreed that Entergy would provide, at its own cost, workers' compensation insurance for IMC's employees through an owner provided insurance program, or OPIP, in exchange for IMC's lower contract price. Entergy complied with its obligation under the agreement by purchasing workers' compensation insurance covering IMC's employees. John Summers, an IMC employee, was injured while working at Entergy's Sabine Station plant. He applied for, and received, benefits under the workers' compensation policy purchased by Entergy. He then sued Entergy for negligence. Entergy moved for summary judgment on the ground that it was a statutory employer immune from common-law tort suits. *See* Tex. Lab.Code § 408.001(a). The trial court agreed and granted judgment for Entergy. The court of appeals reversed. 282 S.W.3d 511. We granted Entergy's petition for review to examine whether section 406.121(1) of the Workers' Compensation Act excludes a premises owner from serving as its own general contractor for the purpose of qualifying for immunity as a statutory employer of its contractors' employees.

## II

■ The Act outlines a process by which a general contractor qualifies for immunity from common-law tort claims brought by the employees of its subcontractors.[1] First, the general contractor and subcontractor must enter into a written agreement under which the general contractor provides workers' compensation insurance coverage to the subcontractor and the employees of the subcontractor. *Id.* § 406.123(a).[2] This agreement makes the general contractor a statutory employer of the subcontractor's employees for purposes of the workers' compensation laws. *Id.* § 406.123(e).[3] The statutory employer is entitled to immunity from common-law tort actions brought by the subcontractor's employees, and a covered employee's "exclusive remedy" for work-related injuries is workers' compensation benefits. *Id.* § 408.001(a).[4]

■ Summers first argues that Entergy failed to establish as a matter of law that Entergy and Summers executed a written agreement under which Entergy would provide workers' compensation coverage. *See* Tex. Lab.Code § 406.123(a). Summers' chief argument is that the contract for maintenance, construction, and general services was between IMC and another Entergy company, Entergy Services, Inc., as opposed to Entergy Gulf States, Inc. However, the contract stated that Entergy Services, Inc. acted for itself and as agent for other Entergy Companies, defined to include the Entergy petitioner here. Summers also admitted in his response to Entergy's summary judgment motion that the

1. Such immunity arises when the statutory employer invokes the "exclusive remedy" defense, which limits the employee's "exclusive remedy" to recovery of workers' compensation benefits. Tex. Lab.Code § 408.001(a).

2. "A general contractor and a subcontractor may enter into a written agreement under which the general contractor provides workers' compensation insurance coverage to the subcontractor and the employees of the subcontractor." Tex. Lab.Code § 406.123(a).

3. "An agreement under this section makes the general contractor the employer of the sub-

contractor and the subcontractor's employees only for purposes of the workers' compensation laws of this state." *Id.* § 406.123(e).

4. "Recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage or a legal beneficiary against the employer or an agent or employee of the employer for the death of or a work-related injury sustained by the employee." *Id.* § 408.001(a).

contract was between IMC and Entergy Gulf States. In addition, the blanket contract order states that Entergy would be paying "O.P.I.P. wage rates," indicating that the contract's purpose included insurance coverage. Entergy also offered an affidavit from a risk manager, stating that pursuant to the contract between Entergy and IMC, Entergy agreed to procure a workers' compensation policy for IMC employees. As a matter of law, these documents establish that Entergy satisfied the written agreement requirement under the statute. Under this agreement, the workers' compensation coverage for IMC's employees was secured by Entergy, not IMC. Likewise, it is undisputed that Summers sought and collected benefits for his injury from Entergy's OPIP. Thus, in determining Entergy's qualification as a statutory employer entitled to the exclusive remedy defense, the only remaining inquiry is whether Entergy falls within the Act's definition of "general contractor." TEX. LAB. CODE § 406.121(1). We conclude that it does.

## III

■ The meaning of a statute is a legal question, which we review *de novo* to ascertain and give effect to the Legislature's intent. *F.F.P. Operating Partners., L.P. v. Duenez*, 237 S.W.3d 680, 683 (Tex. 2007). Where text is clear, text is determinative of that intent. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex.2006) ("[W]hen possible, we discern [legislative intent] from the plain meaning of the words chosen."); *see also Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651–52 (Tex.2006). This general rule applies unless enforcing the plain language of the statute as written would produce absurd results. *Fleming Foods of Tex., Inc. v. Rylander*, 6 S.W.3d 278, 284 (Tex.1999). Therefore, our practice when construing a statute is to recognize that "the words [the

Legislature] chooses should be the surest guide to legislative intent." *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 866 (Tex.1999). Only when those words are ambiguous do we "resort to rules of construction or extrinsic aids." *In re Estate of Nash*, 220 S.W.3d 914, 917 (Tex.2007).

■ With these principles in mind, we examine what the Legislature meant by the term "general contractor" in the workers' compensation statute. We do not look to the ordinary, or commonly understood, meaning of the term because the Legislature has supplied its own definition, which we are bound to follow. TEX. GOV'T CODE § 311.011(b). The Legislature defines "general contractor" as:

> [A] person who undertakes to procure the performance of work or a service, either separately or through the use of subcontractors. The term includes a "principal contractor," "original contractor," "prime contractor," or other analogous term. The term does not include a motor carrier that provides a transportation service through the use of an owner operator.

TEX. LAB.CODE § 406.121(1). That a premises owner can be a "person" within the meaning of the statute is not challenged. The dispute, instead, centers on whether one who "undertakes to procure the performance of work" can include a premises owner, or whether that phrase limits the definition of general contractor to non-owner contractors downstream from the owner.

Since the words contained within the definition are not themselves defined, we apply a meaning that is consistent with the common understanding of those terms. According to Black's Law Dictionary, "undertake" generally means to "take on an obligation or task," and "procurement"

means "the act of getting or obtaining something." BLACK'S LAW DICTIONARY 981, 1238 (7th ed.2000). In other words, a general contractor is a person who takes on the task of obtaining the performance of work. That definition does not exclude premises owners; indeed, it describes precisely what Entergy did. In the words of Summers' own summary judgment response, Entergy "entered into a contract with [IMC] for IMC to perform various maintenance work at Entergy's plant in Bridge City, Texas." Therefore, we conclude that a premises owner can be a general contractor under the definition provided in the Act.

IV

The dissent, and some amici, contend that our reading of the statute constitutes a major change in the law that, for the first time, would enable premises owners to become statutory employers entitled to the exclusive remedy defense—a result they say the Legislature never intended. 282 S.W.3d 511. However, the Legislature

enacted the section that established "deemed employer" status in 1917, the very first provision to address a subscriber's coverage of subcontractors' employees. *See* Act of Mar. 28, 1917, 35th Leg., R.S., ch. 103, § 1, Part II, sec. 6, 1917 Tex. Gen. Laws 269, 284–85. Since then, subsequent revisions have not indicated an intent to create the kind of exception for owner-subscribers the dissent would now recognize. Indeed, when the "deemed employer" statute was first enacted, the Act made no reference at all to "general contractors." Instead, the provision applied only to "subscribers," a general term that included *all* purchasers of workers' compensation insurance.[5] *Id.* Under this 1917 version, the statutory language broadly established, without qualification, that any subscriber, even a premises owner-subscriber, could qualify as a statutory employer. When the Legislature added the "written agreement" provision in 1983, definitions for "prime contractor" and "subcontractor" were also added, but the term

---

5. It has long been the policy of this State, expressed in every version of the Act, that no subscriber can avoid covering an injured worker merely because he was employed by a subcontractor. The 1917 version of the Act created a "deemed" employer status to address this concern:

> If any subscriber to this Act with the purpose and intention of avoiding any liability imposed by the terms of the Act sublets the whole or any part of the work to be performed or done by said subscriber to any sub-contractor, then in the event any employe[e] of such sub-contractor sustains an injury in the course of his employment he shall be deemed to be and taken for all purposes of this Act to be the employe[e] of the subscriber, and in addition thereto such employe[e] shall have an independent right of action against such sub-contractor, which shall in no way be affected by any compensation to be received by him under the terms and provisions of this Act.

Act of Mar. 28, 1917, 35th Leg., R.S., ch. 103, § 1, Part II, sec. 6, 1917 Tex. Gen. Laws 269,

284–85. In 1983, HB 1852 amended the statute by adding a different provision using the term "prime contractor," defined to mean "the person who has undertaken to procure the performance of work or services." Act of May 28, 1983, 68th Leg., R.S., ch. 950, § 1, sec. 6, 1983 Tex. Gen. Laws 5210, 5210–11. Then, in 1989, the last major overhaul of the Act kept the "undertaken to" definition, but substituted the term "prime contractor" for "general contractor" and defined that person with the same language: "a person who has undertaken to procure the performance of work or services, either separately or through the use of subcontractors." Act of Dec. 12, 1989, 71st Leg., 2d C.S., ch. 1, § 3.05, 1989 Tex. Gen. Laws 1, 15. The 1917 "deemed employer" provision remains virtually unchanged in the current Labor Code, except the term "subscriber" has been replaced by the term, "person who has workers' compensation insurance coverage." Act of May 12, 1993, 73rd Leg., R.S., ch. 269, § 1, 1993 Tex. Gen. Laws 987, 1159 (current version at TEX. LAB.CODE § 406.124).

"subscriber" and the original "deemed employer" language were retained in the Act verbatim. Act of May 28, 1983, 68th Leg., R.S., ch. 950, § 1, sec. 6, 1983 Tex. Gen. Laws 5210, 5210–11. The Act made no distinction between different kinds of entities up and down the contracting chain, for a good reason. For the purposes of the statute, it would be just as bad for owner-subscribers to try to avoid covering workers by subcontracting out the work as it would be for general contractors, subcontractors, or any other subscriber to do the same. The dissent fails to explain why the mere restructuring of this provision in 1983, which left in the old language referring to subscribers, demonstrates a legislative intent to reorder the scope of the Act's coverage, not in a way that is consistent with its purpose of protecting workers by promoting coverage, but instead in a way that carves out an owner-exception from the Act's protection for subscribers. Nor does the dissent attempt to explain why, if such a significant change in long-standing policy was intended, it was done in such an obscure manner.

## V

The dissent contends that the Act never covered premises owners in the first place, and that owners were not included within the definition of general contractors in the 1989 amendment. We disagree. The originating statute applied to "any subscriber," which necessarily means that, under the old version of the Act, a subscriber who also happened to be a premises owner would not be permitted to escape liability to a worker by contracting out the work.

By operation of the statute, then, the owner-subscriber who contracted out work to avoid liability for its workers' injuries would nevertheless be considered the employer, the injured worker would be entitled to benefits under the owner's workers' compensation policy, and the owner would be entitled to assert the exclusive remedy defense. *See* Act of Mar. 28, 1917, 35th Leg., R.S., ch. 103, § 1, Part II, sec. 6, 1917 Tex. Gen. Laws 269, 284–85. So while the provision may have been enacted for the purpose of preventing employers from trying to avoid liability, the scope of its application did not exclude premises owners.

In 1983, however, an amendment provided, for the first time, for *voluntary* employer status for upstream entities in the contracting chain through the use of written agreements between parties. Act of May 28, 1983, 68th Leg., R.S., ch. 950, § 1, sec. 6, 1983 Tex. Gen. Laws 5210, 5210–11. More specifically, a general contractor was permitted to enter into a written agreement to provide workers' compensation insurance coverage to its subcontractors and its subcontractors employees and, upon doing so, the "prime contractor"[6] would become, by virtue of the statute, the deemed employer of the subcontractors' employees entitled to the exclusive remedy defense. The provisions of the old law survived the amendment[7] so, as before, "all subscribers" remained eligible for deemed employer status, including premises owners. The question that we address today is whether the Legislature, when it amended the statute, intended to exclude premises owners

---

**6.** "Prime contractor" was later replaced by the current term, "general contractor," but the definition remained substantively verbatim. Act of May 28, 1983, 68th Leg., R.S., ch. 950, § 1, sec. 6(c), 1983 Tex. Gen. Laws 5210, 5210–11 *amended by* Act of Dec. 12, 1989, 71st Leg., 2d C.S., ch. 1, § 3.05(a)(2), 1989

Tex. Gen. Laws 1, 15 (current version at TEX. LAB.CODE § 406.121(1)).

**7.** Act of May 28, 1983, 68th Leg., R.S., ch. 950, § 1, sec. 6(d), 1983 Tex. Gen. Laws 5210, 5211 (current version at TEX. LAB.CODE § 406.124).

from the class of entities that would now be entitled to voluntarily contract for deemed employer status. We conclude that it did not.

There can be no doubt that premises owners can be, and often are, employers who carry workers' compensation insurance. It is also true that owners frequently contract with others to perform work on their premises. But there has never been a requirement that an owner must first engage a general contractor to have work done on its premises. The owner is free to do the work with its own employees, to directly contract with others to do the work, or to do the work using some combination of the two. The dissent says an owner can be an employer, but cannot be a general contractor. However, we can find nothing in the statute specifying that an owner who also wears the hat of a general contractor is disqualified from coverage under the Workers' Compensation Act simply because it chooses to contract directly for work on its premises.

Entergy did the very thing the Legislature has long tried to encourage; that is, Entergy became a subscriber by taking out a workers' compensation policy for the entire work site. It would be an odd result, indeed, if this premises owner, acting as its own general contractor, and further acting in accordance with the State's strong public policy interest of encouraging workers' compensation insurance coverage for workers, was now to be *excluded* from the Act's protections. *See Tex. Workers' Comp. Comm'n v. Garcia,* 893 S.W.2d 504, 510–16 (Tex.1995). Whether a premises owner, general contractor, prime contractor, or subcontractor, Entergy is a "subscriber" of a workers' compensation policy and therefore satisfies the Legislature's intent to ensure consistent and reliable coverage to all employees.

## VI

The dissent and the court of appeals contend that the only way to qualify as a "general contractor" is to be included in a "tripartite" relationship in which a general contractor in the middle of the transaction has, first, undertaken to perform work for an owner, and second, contracted part of that work to a subcontractor. 282 S.W.3d 511. But the statute is not written so restrictively as to encompass *only* a three-party relationship, for several reasons. First, such a construction ignores the single exception found in the last sentence of the definition: "The term does not include a motor carrier that provides a transportation service through the use of an owner operator." TEX. LAB.CODE § 406.121(1). Here, the inclusion of an "owner operator" in the definition's only exception indicates that the Legislature intended for *some* owners to qualify as general contractors, while carving out only a *narrow* class of owners excluded from the term. *Id.* Since the Legislature clearly specified that the exception apply only to a very narrow class, we decline to read this narrow exception broadly to include *all* premises owners.

Second, the definition is not as restrictive as the dissent supposes because the second sentence of the definition, which specifies types of contractors to be included within the definition, specifically provides that the list is non-exhaustive. *Id.* ("The term includes a 'principal contractor,' 'original contractor,' 'prime contractor,' or other analogous term."). If we held that an "owner contractor" is not analogous to a "principal contractor," "original contractor," or "prime contractor," we would essentially be strictly construing a sentence that is *explicitly* non-exhaustive, as even the dissent concedes. 282 S.W.3d 511. Inasmuch as we have been instructed that " '[i]ncludes' and 'in-

cluding' are terms of enlargement and not of limitation or exclusive enumeration," Tex. Gov't Code § 311.005(13), we are restrained from circumventing Legislative intent by excluding from a non-exhaustive list a term as similar as "owner contractor." This is especially true since the original version of the Act, which shared the common purpose of encouraging coverage of subcontractors' employees, did not define any of these disputed terms, but rather utilized a single term, "subscriber." *See* Act of Mar. 28, 1917, 35th Leg., R. S., ch. 103, § 1, Part II, sec. 6, 1917 Tex. Gen. Laws 269, 284–85. Since Entergy is a subscriber of a workers' compensation policy, we cannot read such a non-exhaustive list to evince the Legislature's intent to remove Entergy from a category in which it would have been included under previous versions of the same act.

Additionally, such a reading renders meaningless the part of the definition that qualifies *how* a general contractor "undertakes to procure the performance of work." Tex. Lab.Code § 406.121(1) (a general contractor "undertakes to procure the performance of work or a service, *either separately or through the use of subcontractors*") (emphasis added). A reasonable reading of the words, "either separately or through the use of subcontractors," recognizes the distinction between the owner who takes it upon himself "separately" to procure the performance of work from subcontractors, and the owner who undertakes with a middleman "general contractor" to procure the performance of work "through the use of subcontractors." *See id.; see also* Black's Law Dictionary 1099 (7th ed. 2000) ("Separate" is defined as "individual; distinct, particular; disconnected"). Certainly, one can hire a bricklayer, electrician, or cabinet maker to remodel his own office building— thereby acting "separately"—or, he can hire a general contractor to do the same thing—thereby acting "through the use of subcontractors." This qualifier suggests that the Legislature at least contemplated the existence of a premises owner who may want to act as its own general contractor—an outcome that is by no means uncommon.[8] The dissent's

---

8. *See, e.g., CLDC Mgmt. Corp. v. Geschke*, 72 F.3d 1347, 1349 (7th Cir.1996) (noting that "the Geschkes chose to act as their own general contractor on the job"); *Milwaukee & Southeast Wisconsin Dist. Council of Carpenters v. Rowley–Schlimgen, Inc.*, 2 F.3d 765, 767–68 (7th Cir.1993) ("[T]he Board held that Church's Fried Chicken ... functioned as its own general contractor in the 'continuing operation of building stores.' "); *Applewood Landscape & Nursery Co., Inc. v. Hollingsworth*, 884 F.2d 1502, 1503 (1st Cir.1989) (noting that appellant who built house for himself "decided to act as his own general contractor, at least in respect to landscaping"); *Lazar Bros. Trucking, Inc. v. A & B Excavating, Inc.*, 365 Ill.App.3d 559, 302 Ill. Dec. 778, 850 N.E.2d 215, 217 (2006) (noting that appellee "sought to develop land it owned" and "decided to act as its own general contractor for the project"); *1000 Va. Ltd. P'ship v. Vertecs Corp.*, 158 Wash.2d 566, 146 P.3d 423, 426 (2006) (noting that partnership, "acting as its own general contractor, built an apartment complex"); *Waggoner Motors, Inc. v. Waverly Church of Christ*, 159 S.W.3d 42, 47 (Tenn.Ct.App.2004) (noting that appellant "church, acting as its own general contractor, began constructing a 9,000–square–foot general purpose building in back of its existing building"); *Mortenson v. Leatherwood Constr., Inc.*, 137 S.W.3d 529, 531 (Mo.Ct.App.2004) (noting that school district "acted as its own general contractor" on project to construct addition to school); *Wheeler v. T.L. Roofing, Inc.*, 74 P.3d 499, 501 (Colo.Ct.App.2003) (noting that, on roofing job, "[p]laintiff acted as his own general contractor"); *Cuero v. Ryland Group, Inc.*, 849 So.2d 326, 329 (Fla. Dist.Ct.App.2003) ("Ryland undertook to develop its own property acting as it own general contractor."); *Harris v. Rio Hotel & Casino, Inc.*, 117 Nev. 482, 25 P.3d 206, 207–08 (2001) (holding that landowner could be deemed a statutory employer entitled to workers' compensation immunity).

reading would have us read out this qualifier entirely, but we do not interpret a statute in a manner that renders parts of it meaningless. *See Kerrville State Hosp. v. Fernandez,* 28 S.W.3d 1, 8 (Tex.2000) (citing *City of LaPorte v. Barfield,* 898 S.W.2d 288, 292 (Tex. 1995)).

Finally, we address *Williams v. Brown & Root, Inc.,* the case relied on by the court of appeals in reaching its conclusion that a premises owner is excluded from the Act's definition of "general contractor." 947 S.W.2d 673 (Tex.App.-Texarkana 1997, no writ). In *Williams,* a premises owner, Eastman, contracted with Brown & Root to provide occasional construction services. *Id.* at 675. Brown & Root subcontracted part of the work to Tracer. *Id.* Tracer's employee, Williams, was injured on Eastman's jobsite, so he applied for and received benefits from Eastman's workers' compensation policy covering Tracer. *Id.* After Williams sued Eastman and Brown & Root for his injuries, the trial court granted summary judgment for both defendants, in part because the exclusive remedy was workers' compensation insurance, which had already been provided. *Id.* On appeal, the court of appeals rejected the argument that the predecessor to this section of the Act[9] did not contemplate granting immunity to more than one general contractor. *Id.* at 676–77. Instead, the court of appeals held that Brown & Root qualified as a general contractor because it procured Tracer's services, adding that even if the statute protected only one general contractor, that party was Brown & Root because "[a] general contractor is any person who contracts directly with the owner." *Id.* at 677 (internal citations and quotations omitted).

"Arguably," the court observed, "because Eastman did not contract with the owner, but instead was the owner, Eastman was not protected [by the statute]." *Id.* Not only was the court's observation here unnecessary to the decision in the case, it was also erroneous. The court erred by subordinating the statute's specific definition of "general contractor" in favor of a generic definition outside the statute. *Id.* at 677 ("A general contractor is any person who contracts directly with the owner . . . .") (internal citations and quotations omitted). Since the Legislature provided its own definition for "general contractor," we elevate the Legislature's substituted meaning even when it departs from the term's ordinary meaning. Tex. Gov't Code § 311.011(b).

## VII

We granted rehearing to address several supplemental arguments made by the respondent and by a number of amici, many of which urge us to address the issue before us by going beyond the statutory text and looking to extrinsic aides such as the Act's legislative history. But we have been clear that we do not resort to such extrinsic aides unless the plain language is ambiguous. *See, e.g., Nash,* 220 S.W.3d at 917 ("If a statute is clear and unambiguous, we apply its words according to their common meaning without resort to rules of construction or extrinsic aides."); *Sheshunoff,* 209 S.W.3d at 652 n. 4.

Even if we assume the definition of "general contractor" is ambiguous, the legislative history of the bill's passage favors Entergy, not Summers. The legislative history that supports Summers' outcome is

---

9. Act of Dec. 12, 1989, 71st Leg., 2d C.S., ch. 1, § 3.05, 1989 Tex. Gen. Laws 1, 15, *repealed by* Act of May 22, 1993, 73rd Leg., R.S., ch. 269, § 5, 1993 Tex. Gen. Laws 987, 1273 (current version at Tex Lab.Code § 406.121).

apparent only in bills that *failed* to pass,[10] yet "we attach no controlling significance to the Legislature's failure to enact [legislation]," *Texas Employment Comm'n v. Holberg*, 440 S.W.2d 38, 42 (Tex.1969), for the simple reason that "[i]t is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process." *Dist. of Columbia v. Heller*, —— U.S. ——, ——, 128 S.Ct. 2783, 2796, 171 L.Ed.2d 637 (2008); *see also Dutcher v. Owens*, 647 S.W.2d 948, 950 (Tex.1983) (discerning legislative intent from failed bills would be mere "inference" that "would involve little more than conjecture").[11]

As for the legislative history of what *did* pass, the 1989 overhaul of the Workers' Compensation Act amended the statutory definition of "subcontractor." Under the pre–1989 definition, a subcontractor was defined as "a person who has contracted to perform all or any part of the work or services which a prime contractor has contracted *with another party* to perform." Act of May 28, 1983, 68th Leg. R.S., ch. 950, § 1, 1983 Tex. Gen. Laws 5210, 5210, *amended by* Act of Dec. 11, 1989, 71st Leg.2d C.S., ch.1, § 3.05(a)(5), 1989 Tex. Gen. Laws 1, 15 (emphasis added). The Act, as amended, deleted "with another party," which is the very phrase that Summers argues *prevents* a premises owner from also being the general contractor. *See Wilkerson v. Monsanto Co.*, 782 F.Supp. 1187, 1188–89 (E.D.Tex.1991) (interpreting "contracted with another party" in the pre–1989 definition to mean the prime contractor and premises owner must be distinct entities). We give weight to the deletion of the phrase "with another party" from the amended definition since we presume that deletions are intentional and that lawmakers enact statutes with complete knowledge of existing law. *See Acker v. Tex. Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990). It is, of course, axiomatic that the deletion of language better indicates the Legislature's intent to remove its effect, rather than to preserve it. Thus, the removal of the phrase "with another party" from the subcontractor definition favors, rather than argues against, an interpretation allowing premises owners to act as their own general contractors for the purpose of workers' compensation laws. Tex. Lab.Code § 406.121(5). Enforcing the law as written is a court's safest refuge in matters of statutory construction, and we should always refrain from rewriting text that lawmakers chose, but we should be particularly unwilling to reinsert language that the Legislature has elected to delete. *See Simmons v. Arnim*, 110 Tex. 309, 220 S.W. 66, 70 (1920) ("Courts must take statutes as they find them.").

Amici cite to statements by some lawmakers that the Act, and particularly the 1989 amendment, was never intended to provide statutory employer status to premises owners. Just as we decline to consider failed attempts to pass legislation, we likewise decline consideration of law-

---

**10.** Summers and amici point to nine failed bills as evidence the Legislature has "repeatedly" rejected efforts to let premises owners assert the exclusive remedy defense. Chronologically, the bills are HB 2279 from the 74th Legislature (1995), HBs 2630 and 3024 from the 75th Legislature (1997), SB 1404 from the 76th Legislature (1999), HBs 3120 and 3459 from the 77th Legislature (2001), HB 2982 and SB 675 from the 78th Legislature (2003), and HB 1626 from the 79th Legislature (2005).

**11.** Even if we were to consider failed bills, these cited bills were not only unsuccessful but, with one possible exception, unrelated to this case. *See* SB 1404 from the 76th Legislature (1999) (amending "general contractor" to include "an owner or lessor of real property").

makers' post-hoc statements as to what a statute means. It has been our consistent view that "[e]xplanations produced, after the fact, by individual legislators are not statutory history, and can provide little guidance as to what the legislature collectively intended." *In re Doe*, 19 S.W.3d 346, 352 (Tex.2000) (citations and quotations omitted). At bottom, at least some of the amici seem to argue that the workers' compensation scheme is itself inadequate, and that an injured employee should have remedies available apart from the benefits offered by the Act, including the ability to sue a negligent premises owner. As a judicial question, this argument lacks merit because the availability and adequacy of workers' compensation benefits is a purely legislative matter.

## VIII

Excluding a premises owner who acts as a general contractor also fails to serve the public policy of encouraging workers' compensation coverage for all workers. *See Wingfoot Enters. v. Alvarado*, 111 S.W.3d 134, 140, 142 (Tex.2003); *Garcia*, 893 S.W.2d at 521. As noted, the Act offers incentives to general contractors to provide workers' compensation coverage broadly to work site employees. In exchange, the Act specifically protects general contractors—who are not direct employers of subcontractors' employees—by allowing them to assert as a statutorily deemed employer the exclusive remedy defense. In light of this statutory protection, it would seem to be contrary to the state's public policy to read out of the Act's protections those premises owners who have otherwise qualified under the Act by purchasing workers' compensation coverage for their work site employees, but who have chosen to act as their own general contractor.

In the dissent's view, a premises owner who, in complying with the Act, enters into a written agreement to provide workers' compensation coverage to all contractors and contractors' employees at its work site would be the only contractor-employer in the contracting chain not afforded the exclusive remedy defense. Presumably, in that event all the downstream contractors would be considered subscribers under the premises owner's OPIP, thereby qualifying as statutory employers by virtue of their written agreements. *See* TEX. LAB.CODE § 406.123(a). But the dissent would disqualify the premises owner—the one who secured and actually paid for the policy—from being a statutory employer of his subcontractors' employees. As a result, the premises owner's own employees, working side-by-side with the other contractors' employees, would be limited to workers' compensation benefits for their injuries while the other contractors' employees injured in the same accident would be permitted to seek tort remedies against the premises owner in addition to the workers' compensation benefits provided by the premises owner. Unless the statute directs such a result, it makes no sense to read the statute in such an unreasonable manner. The dissent contends that this outcome is a policy choice made by the Legislature, but we interpret the statute in the context of a policy that *encourages* the provision of workers' compensation coverage to all workers on a given work site, not *discouraging* it by denying the statute's protections to the owner who enters into just such a plan.

## IX

We conclude that Entergy qualifies under the Act's definition as a "general contractor" and, as a statutory employer, is entitled to assert the exclusive remedy defense. TEX. LAB.CODE § 408.001. The judgment of the court of appeals is re-

versed and a take-nothing judgment is rendered in favor Entergy.

Justice HECHT filed a concurring opinion.

Justice HECHT, concurring.

I think the Court's construction of the statutory text is reasonable, but so is the dissent's (though I disagree with much of its analysis), which means that the provisions are ambiguous and can be understood correctly only in the context of the Texas Workers' Compensation Act as a whole. I join in all but Part VII of the Court's opinion and write separately to explain my reasons for doing so, which come down to this: the Act encourages coverage, as does the Court's construction, but the dissent's does not.

I

Ascertaining the meaning of a statutory text (or any text for that matter) begins with the language used, and if that language is plain enough, absent some obvious error or an absurd result, that is where the task ends.[1] It matters not what someone thinks the text may have meant to say or now hopes or wishes it said.[2] To look beyond the plain language risks usurping authorship in the name of interpretation. Construing statutes is the judiciary's prerogative; enacting them is the Legislature's. To prevent trespass, this Court and others have repeatedly stressed that statutory construction must be faithful to the plain language of the text.

But that principle is undermined when it is invoked where it does not apply—that is, when the language of the text is not, in fact, plain. To find plain meaning where it is missing suggests at best that the investigation is insincere or incompetent, at worst that the search is rigged, that the outcome, whatever it is, will always come out to be "plain". Fidelity to plain meaning is important only if the word "plain" has itself a plain meaning.

I fear the phrase "plain language" has been overworked to the point of exhaustion. It has appeared in published Texas cases more often in the past decade than in the prior fifteen,[3] usually as the basis

1. *Simmons v. Arnim*, 110 Tex. 309, 220 S.W. 66, 70 (1920) ("Courts must take statutes as they find them. More than that, they should be willing to take them as they find them. They should search out carefully the intendment of a statute, giving full effect to all of its terms. But they must find its intent in its language, and not elsewhere. They are not the law-making body. They are not responsible for omissions in legislation. They are responsible for a true and fair interpretation of the written law. It must be an interpretation which expresses only the will of the makers of the law, not forced nor strained, but simply such as the words of the law in their plain sense fairly sanction and will clearly sustain."), quoted in *St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 505 (Tex. 1997), *RepublicBank Dallas, N.A. v. Interkal, Inc.*, 691 S.W.2d 605, 607 (Tex.1985), and *Texas Highway Comm'n v. El Paso Bldg. & Constr. Trades Council*, 149 Tex. 457, 234 S.W.2d 857, 863 (1950); *Fleming Foods of Texas, Inc. v. Rylander*, 6 S.W.3d 278, 284 (Tex.1999) ("These specific, unambiguous statutes are the current law and should not be construed by a court to mean something other than the plain words say unless there is an obvious error such as a typographical one that resulted in the omission of a word, *see City of Amarillo v. Martin*, 971 S.W.2d 426, 428 n. 1 (Tex.1998), or application of the literal language of a legislative enactment would produce an absurd result, *see id.* (citing *Bridgestone/Firestone, Inc. v. Glyn–Jones*, 878 S.W.2d 132, 135 (Tex.1994) (Hecht, J., concurring)).").

2. *See Black v. Victoria Lloyds Ins. Co.*, 797 S.W.2d 20, 29 (Tex.1990) (Hecht, J., dissenting) (rejecting a "Cartesian theory" for construing insurance policies—" 'I believe, therefore I am insured' ").

3. My Westlaw research reveals 1,501 cases in the past ten years, and 1,464 in the prior 153

for resolving a dispute over meaning, though it can hardly be said that the prevalence of plain language is increasing, let alone exponentially. I detect no waning in the power of the curse at Babel. To the contrary, more and more this Court is called upon to construe statutes which opposing parties insist are unambiguous and mean very different things. A dispute over meaning does not render a text ambiguous;[4] many disputes lack substance. But when language is subject to more than one reasonable interpretation, it is ambiguous.[5] That is the plain meaning of ambiguous. Of course, reasonable people "will sometimes disagree about what reasonable people can disagree about",[6] but even so, it is difficult to maintain that language is plain in the face of a substantial, legitimate dispute over its meaning.[7]

Only every so often do we come right out and brand a text with the a-word,[8] as if it were a mark of shame. It seems nicer to call a statute unclear[9] or better yet, just leave that implication.[10] But the truth is that the meaning of statutory language is often reasonably disputed and therefore ambiguous to some extent, and resolving reasonable disputes with reason, rather than by denying their reasonableness, would result in a sounder jurisprudence. Two great evils attend this course. One is that judges will use analysis of reasonable disagreements over meaning as a guise for substituting their own preferences in place of the legislature's. This would trespass upon the boundary between judicial and legislative spheres that is fundamental to our structure of government. The other is that in the search for the meaning of a statutory provision, courts will grasp at all

years, an increase on average from less than ten cases a year to more than 100 cases a year. Not all are statutory construction cases, but plain language is important in other textual construction. I offer the results only as a very general indication of how the use of the phrase has multiplied.

4. *American Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex.2003); *Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 465 (Tex.1998).

5. *In re Missouri Pac. R.R. Co.*, 998 S.W.2d 212, 217 (Tex.1999) ("The language of the statute could support more than one reasonable interpretation and therefore is ambiguous.").

6. *City of Keller v. Wilson*, 168 S.W.3d 802, 828 (Tex.2005).

7. *See, e.g., Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 484 (Tex.2001) (Hecht, J., dissenting) ("The Court touts its view as the 'plain meaning' of the 'unambiguous language' of the statute. In other words, the split in the circuits is not really a serious dispute; the Second, Third, and Fourth Circuits simply cannot (or perhaps will not) read plain English.").

8. I recall four instances in the past twenty years. *Tooke v. City of Mexia*, 197 S.W.3d 325, 342 (Tex.2006) ("[T]he words 'sue and be sued', standing alone, are if anything, unclear and ambiguous."); *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 701 (Tex.2003) ("The statute's ambiguity precludes our finding an unmistakable Legislative intent to waive sovereign immunity."); *In re Missouri Pac. R.R. Co.*, 998 S.W.2d at 217; *Stracener v. United Servs. Auto Ass'n*, 777 S.W.2d 378, 383 (Tex.1989) ("We find that this separation of the clause [with a comma] creates an ambiguity....").

9. *E.g., TXU Elec. Co. v. Pub. Util. Comm'n of Tex.*, 51 S.W.3d 275, 286 (Tex.2001) (Owen, J., concurring and stating the opinion of the Court) ("We conclude ... that the PURA is unclear....").

10. *E.g., City of Corpus Christi v. Pub. Util. Comm'n of Tex.*, 51 S.W.3d 231, 261 (Tex. 2001) (Owen, J., concurring and stating the opinion of the Court) ("[W]hen faced with an ambiguous code provision, we give some deference to the Commission's interpretation when it is reasonable.... Under the circumstances presented here, we cannot say that the Commission's interpretation ... is an unreasonable one....").

sorts of statements made before, during, and after the process of enactment, whether by legislators or others, as relevant or even authoritative. The Legislature does not speak through individuals—even its members—in committee hearings, in bill analyses and reports, in legislative debate, or in pre-and post-enactment commentary; it speaks through its enactments.

Rather than struggle to understand and explain a difficult text, it might seem easier to fall back on a simple insistence that all language have a plain meaning, but doing so risks leaving the impression that the court is not being entirely honest. Courts must scrupulously guard against both evils, but in doing so, cannot ignore a statute's context that may illumine its meaning. Years ago Special Chief Justice Samuels [11] wrote for this Court:

> A statute should not be construed in a spirit of detachment as if it were a protoplasm floating around in space. The historical treatment to which a statute may be subjected is aptly set forth in *Travelers' Insurance Co. v. Marshall,* 124 Tex. 45, 76 S.W.2d 1007, 1012 … [1934], where it is said: 'Generally it may be said that in determining the meaning, intent, and purpose of a law or constitutional provision, the history of the times out of which it grew, and to which it may be rationally supposed to bear some direct relationship, the evils intended to be remedied, and the good to be accomplished, are proper subjects of inquiry.' [12]

## II

The Workers' Compensation Act provides that a general contractor who agrees to furnish workers' compensation insurance coverage to a subcontractor and its employees becomes their employer for purposes of the Act—their statutory employer, if you will—so that their exclusive remedy against the general contractor for on-the-job injuries is compensation benefits. Specifically, the relevant provisions of the Labor Code state:

11. Special Chief Justice Sidney L. Samuels of Fort Worth was designated by Governor Ross Sterling in January 1932 to sit for Chief Justice Cureton under a statute now codified as section 22.005 of the Texas Government Code. The case involved a private claim against the State to lands in the once-disputed "Alsace–Lorraine" region along the 100th meridian from the Red River to the 36° 30' parallel dividing Texas and the Indian territories that later became Oklahoma. The United States Supreme Court finally held in *Oklahoma v. Texas,* 272 U.S. 21, 47 S.Ct. 9, 71 L.Ed. 145 (1926), that the region belonged to Texas. Chief Justice Cureton was disqualified because he had represented Texas' interests in the dispute. The Court took just nine years to decide the case. Interestingly, James V. Allred had also represented Texas' interests while Attorney General, and when the case was decided, had served two terms as Governor and been nominated to serve as a federal judge, all the while being shown as counsel for the State in the case. (The most famous exercise of the designation power was surely Governor Pat Neff's appointment of a Special Supreme Court consisting of three women, Mrs. Hortense Ward, Special Chief Justice, and Miss Ruth Virginia Brazzil and Miss Hattie L. Henenberg, Special Associate Justices, to hear and determine the issues in *Johnson v. Darr,* 114 Tex. 516, 272 S.W. 1098 (1925).)

12. *Wortham v. Walker,* 133 Tex. 255, 128 S.W.2d 1138, 1150 (1939); *see also* TEX. GOV'T CODE § 311.023 ("In construing a statute, whether or not the statute is considered ambiguous on its face, a court may consider among other matters the: (1) object sought to be attained; (2) circumstances under which the statute was enacted; (3) legislative history; (4) common law or former statutory provisions, including laws on the same or similar subjects; (5) consequences of a particular construction; (6) administrative construction of the statute; and (7) title (caption), preamble, and emergency provision."); *id.* § 312.005 ("In interpreting a statute, a court shall diligently attempt to ascertain legislative intent and shall consider at all times the old law, the evil, and the remedy.").

A general contractor and a subcontractor may enter into a written agreement under which the general contractor provides workers' compensation insurance coverage to the subcontractor and the employees of the subcontractor.[13]

"General contractor" means a person who undertakes to procure the performance of work or a service, either separately or through the use of subcontractors. The term includes a "principal contractor," "original contractor," "prime contractor," or other analogous term. The term does not include a motor carrier that provides a transportation service through the use of an owner operator.[14]

"Subcontractor" means a person who contracts with a general contractor to perform all or part of the work or services that the general contractor has undertaken to perform.[15]

An agreement under this section makes the general contractor the employer of the subcontractor and the subcontractor's employees only for purposes of the workers' compensation laws of this state.[16]

Recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage or a legal beneficiary against the employer or an agent or employee of the employer for the death of or a work-related injury sustained by the employee.[17]

The question is whether a person who subcontracts work to be done on his own property is a general contractor for purposes of these provisions. In the Court's first opinion, we all thought from the "plain and ordinary meaning" of the provisions the answer was clearly yes.[18] On rehearing, after reargument and a number of amicus briefs, three MEMBERS of the Court now disagree and think that the statutory language "seems clear"[19] and "compels the conclusion"[20] that the answer is no. The difficulty is this: while it is true, as the Court contends, that a person who engages subcontractors to work on his own property is often said to act as his own general contractor and certainly performs that function, more often, as the dissent contends, a general contractor is thought of as a person who works for someone else, like a property owner, subcontracting parts of a job to others as appropriate. On the face of it, either reading of the statute seems reasonable. The text, it must therefore be said, is ambiguous.

Scrutinizing the text does not resolve the difficulty. The statutory definition of "general contractor" has three components. The first is this prescription: " 'General contractor' means a person who undertakes to procure the performance of work or a service, either separately or through the use of subcontractors." A premises owner who undertakes to procure the performance of work or service on his property would appear to fit this definition of general contractor. A premises

13. TEX. LAB.CODE § 406.123(a).

14. *Id.* § 406.121(1).

15. *Id.* § 406.121(5).

16. *Id.* § 406.123(e).

17. *Id.* § 408.001(a).

18. 2007 WL 2458027, 50 Tex. Sup.Ct. J. 1140, 1143 (Aug. 31, 2007) ("Construing the statute according to its plain and ordinary meaning, Entergy is a general contractor because it '[undertook] to procure the performance of work' from IMC." (brackets in original)).

19. *Post* at 489.

20. *Post* at 483.

owner can undertake to procure work or service for himself, through subcontractors for example, or he may employ someone else to procure the work or service—the subcontractors—for him. Nothing in the statute's use of the word "undertakes" suggests any difference in its ordinary meaning.

The second component of the statutory definition is a non-exclusive list of examples: "The term includes a 'principal contractor,' 'original contractor,' 'prime contractor,' or other analogous term." The dissent asserts that "we have for decades defined a contractor as 'any person who, in the pursuit of an independent business, undertakes to do a specific piece of work *for other persons ....*'", quoting a 1942 decision of this Court, *Industrial Indemnity Exchange v. Southard,*[21] which in turn quoted a 1924 decision of the commission of appeals, *Shannon v. Western Indemnity Co.*[22] But the issue in *Southard* was whether the claimant was an *independent* contractor, and the quoted passage addresses that issue, as is clear from its context:

> Many definitions of what is meant by the term 'independent contractor' have been given. They all rest substantially on the same basic principle. In the case of *Shannon v. Western Indemnity Co., Tex. Com.App.,* 257 S.W. 522, 524, this Court announced, as the basis for the opinion rendered in that case, the following definition: 'A contractor is any person who, in the pursuit of an independent business, undertakes to do a

specific piece of work for other persons, using his own means and methods, without submitting himself to their control in respect to all its details.'[23]

The issue was the same in *Shannon,* a case decided by the commission of appeals. Certainly, a person could not act as his own independent contractor; his independence would be severely compromised. But nothing in either case suggests that an owner cannot act as his own general contractor. The dissent points out correctly that the Legislature has sometimes used "general contractor" in a way that excludes a premises owner.[24] But the Court cites instances in which a person who hires subcontractors directly is said to act as his own general contractor, suggesting that it is a common expression.[25] One cannot be sure from the text alone whether the Legislature meant for owners to be, or not to be, general contractors.

The list of examples is specifically non-exclusive but obviously intended to illustrate similarities.[26] The dissent argues that a premises owner cannot be a general contractor because the 1979 edition of *Black's Law Dictionary* defined a "contractor" as "a person who, in the pursuit of any independent business, undertakes to do a specific piece of work for other persons".[27] But the rest of the definition is not so restrictive:

> This term is strictly applicable to any person who enters into a contract, but is commonly reserved to designate one

---

**21.** 138 Tex. 531, 160 S.W.2d 905, 907 (1942).

**22.** 257 S.W. 522, 524 (Tex. Comm'n App. 1924, judgm't adopted).

**23.** 160 S.W.2d at 907.

**24.** *Post* at 481–82.

**25.** *Ante* at 448.

**26.** *See Hilco Elec. Coop. v. Midlothian Butane Gas Co.,* 111 S.W.3d 75, 81 (Tex.2003) ("[T]he rule of *ejusdem generis* ... provides that when words of a general nature are used in connection with the designation of particular objects or classes of persons or things, the meaning of the general words will be restricted to the particular designation.").

**27.** Black's Law Dictionary 295 (5th ed.1979).

who, for a fixed price, undertakes to procure the performance of works or services on a large scale, or the furnishing of goods in large quantities, whether for the public or a company or individual. Such are generally classified as general contractors (responsible for the entire job) and subcontractors (responsible for only portion of job; *e.g.* plumber, carpenter).[28]

The definitions describe someone who might or might not be the owner of the jobsite. The same dictionary gives this definition of "general contractor":

> One who contracts for the construction of an entire building or project, rather than for a portion of the work. The general contractor hires subcontractors (*e.g.* plumbing, electrical, etc.), coordinates all work, and is responsible for payment to subcontractors. Also called "prime" contractor.[29]

It defines "prime contractor" thusly:

> The party to a building contract who is charged with the total construction and who enters into sub-contracts for such work as electrical, plumbing, and the like. Also called "general contractor."[30]

Neither of these definitions excludes a jobsite owner from acting as his own general contractor. Other dictionaries are similarly inconclusive.[31] The second component does not clearly indicate whether a jobsite owner is or is not to be treated as a general contractor.

The third component of the statutory definition is an exclusion: "The term does not include a motor carrier that provides a transportation service through the use of an owner operator." The Court argues that expressing only one exclusion suggests that no others exist.[32] The dissent offers this tautological explanation of the exclusion: "the Legislature likely expressly excluded motor carriers from the general-contractor definition to make it clear that, even though they might otherwise fit the general-contractor construct, they are to be treated differently."[33] I dare say that it was not merely likely but absolutely certain that by excluding motor carriers, the Legislature meant to make clear they are to be treated differently. But the dissent misses the Court's point: if the Legislature intended to make clear who should not be treated as a general contractor, as we all think it did, and it listed motor carriers but not premises owners,

---

28. *Id.*

29. *Id.* at 615.

30. *Id.* at 1072.

31. BLACK'S LAW DICTIONARY 350 (8th ed.2004) ("**contractor. 1.** A party to a contract. **2.** More specif., one who contracts to do work or provide supplies for another."); *id.* at 351 ("*general contractor.* One who contracts for the completion of an entire project, including purchasing all materials, hiring and paying subcontractors, and coordinating all the work.—Also termed *original contractor; prime contractor.*"); THE OXFORD ENGLISH DICTIONARY 837 (2d ed. 1989) ("One who contracts or undertakes to supply certain articles, or to perform any work or service (*esp.* for government or other public body), at a certain price

or rate; in the building and related trades, one who is prepared to undertake work by contract."); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 495 (1981) ("**contractor** ... **1 a:** one that contracts: a party to a bargain: one that formally undertakes to do something for another **b:** one that performs work (as a printing job) or provides supplies on a large scale (as to troops) according to a contractual agreement at a price predetermined by his own calculations **c:** one who contracts on predetermined terms to provide labor and materials and to be responsible for the performance of a construction job in accordance with established specifications or plans—called also *building contractor*").

32. *Ante* at 437.

33. *Post* at 487.

then premises owners should be treated as general contractors.

The statutory definition of "subcontractor"—"a person who contracts with a general contractor to perform all or part of the work or services that the general contractor has undertaken to perform"—does not help clarify the matter. A premises owner may be a general contractor who "undertake[s] to perform" work by contracting with subcontractors.

Examined with precision, the statutory text can reasonably be read to provide that a person who undertakes to procure work or service is no less a general contractor because he also happens to own the premises where the job is to be done, and no less a statutory employer when he provides workers' compensation insurance coverage for subcontractors and their employees. That, of course, is why the Court was unanimous in its first opinion. The dissenters too quickly dismiss a position they so recently embraced unreservedly; sometimes wrong, they are never in doubt. But their basic argument has weight: general contractor often refers to someone

who works for the job owner. This reading of the statute is a reasonable one, in my view, but it is not the only reasonable one.

## III

The disagreement in this case is not over words and cannot be resolved with dictionaries. It is over consequences and can only be settled by examining how the statutory provisions fit in the context of the Workers' Compensation Act as a whole. The issue for the Court is not whether it is good policy to treat a person who arranges for work to be done on his property as a general contractor, something we cannot decide, but whether such treatment is most consistent with the policies embedded in the Act. For four reasons, I believe it is.

*First:* The Act's "decided bias" is for coverage.[34] Although employees and employers can opt out, an employee has only a limited time frame in which to do so,[35] and an employer is penalized for doing so by loss of his common law defenses to an employee's claim of injury.[36] The Act's

---

34. *Wingfoot Enters. v. Alvarado,* 111 S.W.3d 134, 140 (Tex.2003) ("And in examining the Labor Code's overall scheme for workers' compensation and for protecting workers, we conclude that the Act's decided bias in favor of employers electing to provide coverage for their employees supports our conclusion that the Act permits more than one employer for workers' compensation purposes." (footnote omitted)).

35. Tex. Lab.Code § 406.034(b) ("An employee who desires to retain the common-law right of action to recover damages for personal injuries or death shall notify the employer in writing that the employee waives coverage under this subtitle and retains all rights of action under common law. The employee must notify the employer not later than the fifth day after the date on which the employee: (1) begins the employment; or (2) receives written notice from the employer that the employer has obtained workers' compen-

sation insurance coverage if the employer is not a covered employer at the time of the employment but later obtains the coverage.").

36. *Id.* § 406.033(a) ("In an action against an employer who does not have workers' compensation insurance coverage to recover damages for personal injuries or death sustained by an employee in the course and scope of the employment, it is not a defense that: (1) the employee was guilty of contributory negligence; (2) the employee assumed the risk of injury or death; or (3) the injury or death was caused by the negligence of a fellow employee."); *Kroger Co. v. Keng,* 23 S.W.3d 347, 349 (Tex.2000) ("To encourage employers to obtain workers' compensation insurance, section 406.033 penalizes nonsubscribers by precluding them from asserting certain common-law defenses in their employees' personal-injury actions. . . ."). Still, about a third Texas employers choose not to subscribe to the

encouragement of coverage is furthered by incentivizing general contractors to provide workers' compensation coverage for subcontractors and their employees.[37] No one questions that the Act does this by providing such general contractors the protection of the exclusive remedy. To refuse the incentive when the general contractor happens to own the jobsite would discourage coverage, contrary to the policy of the Act. The dissent responds that because the Act is in derogation of common law rights, it should not be "applied to cases not clearly within its purview".[38] But it has long been "the settled policy of this State to construe liberally the provisions of the [Act] in order to effectuate the purposes for which it was enacted."[39] Coverage is a fundamental purpose of the Act.

*Second:* Since 1917, the Act has expressly prohibited a subscriber from using a subcontractor to circumvent coverage.[40]

---

**37.** *Wingfoot Enters.*, 111 S.W.3d at 142 ("[S]ection 406.123 (covering general contractors and subcontractors), like other workers' compensation provisions in the Code, encourage[s] employers to obtain workers' compensation insurance coverage by providing benefits to the employer, including the exclusive remedy provision, if coverage is obtained.").

**38.** *Energy Serv. Co. of Bowie, Inc. v. Superior Snubbing Servs., Inc.*, 236 S.W.3d 190, 194 n. 17 (Tex.2007) (quoting *Satterfield v. Satterfield*, 448 S.W.2d 456, 459 (Tex.1969)).

**39.** *Huffman v. S. Underwriters*, 133 Tex. 354, 128 S.W.2d 4, 6 (1939) (quoted in *In re Poly-America, L.P.*, 262 S.W.3d 337, 350 (Tex. 2008)); *see Millers' Mut. Cas. Co. v. Hoover*, 235 S.W. 863, 864 (Tex. Comm'n App.1921, judgm't adopted) ("It has been thought, inasmuch as the [Act] is in derogation of the common law, that it should be given a strict construction, but the courts have very generally held that a spirit of liberality should characterize its interpretations, for the reason that it is to be classed as remedial legislation." (quotation omitted)); *Southern Sur. Co. v. Inabnit*, 1 S.W.2d 412, 413–414 (Tex.Civ.App.-Eastland 1927, no writ) ("The leading authorities ... agree that Workmen's Compensation Laws came into existence in response to a general acceptation of the broad economic theory that industrial accidents should properly be chargeable as a part of the overhead expenses of the industries. These laws are remedial in their nature, and should be liberally construed with the view of promoting their objects. The early tendency of our courts to construe them strictly because they were thought to be in derogation of common law has long since given place to a liberal rule of construction. The rule now prevailing prevents the restriction of the scope of the laws by exceptions and exact definitions not in harmony with their spirit.").

workers' compensation system. Biennial Report of the Texas Department of Insurance to the 81st Legislature–Division of Workers' Compensation 3 (Dec.2008).

**40.** Act approved Mar. 28, 1917, 35th Leg., R.S., ch. 103, § 1, Part II, § 6, 1917 Tex. Gen. Laws 269, 284–285 ("If any subscriber to this Act with the purpose and intention of avoiding any liability imposed by the terms of the Act sublets the whole or any part of the work to be performed or done by said subscriber to any sub-contractor, then in the event any employe[e] of such sub-contractor sustains an injury in the course of his employment he shall be deemed to be and taken for all purposes of this Act to be the employe[e] of the subscriber, and in addition thereto such employe[e] shall have an independent right of action against such sub-contractor, which shall in no way be affected by any compensation to be received by him under the terms and provisions of this Act."); renumbered § 6(d) by Act of May 28, 1983, 68th Leg., R.S., ch. 950, 1983 Tex. Gen. Laws 5210, 5210–5211; amended by Act of Dec. 12, 1989, 71st Leg., 2d C.S., ch. 1, § 3.05(h), 1989 Tex. Gen. Laws 1, 16, formerly Tex.Rev.Civ. Stat. Ann. art. 8308, § 3.05(h) ("If a person who has workers' compensation insurance coverage subcontracts all or part of the work to be performed by the person to a subcontractor with the purpose and intent to avoid liability as an employer under this Act, an employee of the subcontractor who sustains a compensable injury in the course and scope of the employment shall be treated as an employee of the person for purposes of workers' com-

To prohibit a subscriber who owns the jobsite from engaging subcontractors to avoid paying compensation benefits, while at the same time discouraging the subscriber from providing compensation benefits by denying the exclusive remedy protection, would be a perverse result indeed. The dissent dismisses the policy of discouraging avoidance of coverage, contained in the Act since 1917, as "irrelevant",[41] but there is simply no reason to think that the Act has ever beckoned with one hand and shunned with the other.

*Third:* Since 1963, the Act has provided that a subscribing employer may agree in writing, before a worker has been injured, to assume a third party's liability for the injury.[42] Such agreements appear to be common among contractors on construction jobsites.[43] If the employer is a subcontractor and the third party is a general contractor who has provided coverage for the worker, the worker's exclusive remedy against both is limited to compensation benefits. If the general contractor were not afforded the same protection because he owned the jobsite, the worker could recover common law damages against him, and he in turn could require the subcontractor to assume the liability, thereby defeating the protection of the exclusive remedy to the worker's own employer, even though he and the general contractor both provided compensation benefits. In this case, Entergy had just such an indemnity agreement with IMC.[44] If Summers can

---

pensation and shall also have a separate right of action against the subcontractor, which right of action does not affect the employee's right to compensation under this Act."); codified by Act of May 12, 1993, 73rd Leg., R.S., ch. 269, § 1, 1993 Tex. Gen. Laws 987, 1159, as Tex. Lab.Code § 406.124 ("If a person who has workers' compensation insurance coverage subcontracts all or part of the work to be performed by the person to a subcontractor with the intent to avoid liability as an employer under this subtitle, an employee of the subcontractor who sustains a compensable injury in the course and scope of the employment shall be treated as an employee of the person for purposes of workers' compensation and shall have a separate right of action against the subcontractor. The right of action against the subcontractor does not affect the employee's right to compensation under this subtitle.").

41. *Post* at 480.

42. Act of May 20, 1963, 58th Leg., R.S., ch. 437, § 1, 1963 Tex. Gen. Laws 1132, formerly Tex.Rev.Civ. Stat. Ann. art. 8306, § 3 (1925); amended by Act of Dec. 12, 1989, 71st Leg., 2d C.S., ch. 1, 1989 Tex. Gen. Laws 1, 32–33, formerly Tex.Rev.Civ. Stat. Ann. art. 8308–4.04; and codified by Act of May 12, 1993, 73rd Leg., R.S., ch. 269, § 1, 1993 Tex. Gen. Laws 987, 1235, now Tex. Lab.Code § 417.004 ("In an action for damages brought by an injured employee, a legal beneficiary, or an insurance carrier against a third party liable to pay damages for the injury or death under this chapter that results in a judgment against the third party or a settlement by the third party, the employer is not liable to the third party for reimbursement or damages based on the judgment or settlement unless the employer executed, before the injury or death occurred, a written agreement with the third party to assume the liability.").

43. Brief of Amicus Curiae ABC of Texas, Inc. at 5.

44. The agreement between Entergy and IMC contained these provisions:

> "18. *Indemnity*
> "18.1 To the fullest extent allowed by applicable law, the Contractor agrees that it will indemnify and hold harmless the Entergy Companies, their affiliated and associated companies and any of their agents, officers, directors, shareholders, employees, successors and assigns from any and all claims, losses, costs, damages, expenses, including attorneys fees, and liability by reason of property damage, personal injury (including death), or both such damage and injury of whatsoever nature or kind arising out of or as a result of any negligent or wrongful act or omission in connection with the performance of the Work by the Contractor, its employees, agents, and subcontractors. *THE PARTIES EXPRESSLY*

recover common law damages from Entergy (having already received compensation benefits, of course), Entergy can require reimbursement by IMC, Summers' direct employer. In this situation, the workers' compensation system provides nothing to any employer, even though all employers have agreed to provide compensation benefits to all employees, which the injured worker himself requested and received. This would be an even more perverse disruption of the policies of the Act. The dissent argues that the economic effect of indemnity agreements is minimal because an employer can obtain compensation coverage at a reduced cost through owner-provided policies like Entergy's and can buy general liability insurance for the increased risk of damages not limited by providing compensation coverage. But compensation insurance that provides no protection is no bargain, however reduced the cost, and having to buy two policies for

an increased risk when one policy for a limited risk should do is perverse. The fact that employers often do so, the dissent says, shows they know they must, but all it shows for sure is an unwillingness to put too much trust in the fairness of the law. Anyway, according to the dissent, the problem is "a policy choice the Legislature made." [45] I would not blame the Legislature for a problem that can be avoided by a reasonable construction of the Act.

*Fourth:* The Act creates a comprehensive system,[46] and treating similarly situated contractors and employers differently would disrupt that system unnecessarily. There is no apparent reason why a premises owner should have the exclusive remedy protection when he provides workers' compensation insurance covering his own employees engaged in particular work but not when he provides the same coverage for his subcontractors and their employees, retained to do the same work.[47] The dis-

---

*AGREE THAT THIS INDEMNITY SHALL APPLY EVEN IN THE EVENT OF THE CONCURRENT NEGLIGENCE OF THE ENTERGY COMPANIES.*

"18.2 Further, with respect to Contract Orders being performed by Contractor as an independent contractor with sole rights to direct the Work performed by its employees, the Contractor shall be solely responsible for and shall indemnify and hold harmless the Entergy Companies, their affiliated and associated companies and any of their agents, officers, directors, shareholders, employees, successors or assigns from and against any and all claims, liability, losses, costs, damages and expenses, including attorney fees, on account of the death of or injury to the Contractor or any subcontractors, or to any employees or agents of the Contractor or any subcontractor, caused by, arising out of, or in any way connected with the Work to be performed hereunder, or while the Contractor or any such subcontractors, employees or agents are on or near any of the Sites or Owners' premises, *WITHOUT REGARD TO WHETHER ANY SUCH DEATH OR INJURIES ARE ALLEGED TO HAVE BEEN CAUSED BY OR*

*ARE ATTRIBUTABLE IN WHOLE OR IN PART TO THE NEGLIGENCE OF THE ENTERGY COMPANIES, THEIR EMPLOYEES OR AGENTS, THE CONDITIONS OF THE PREMISES, OR OTHERWISE, AND NOTWITHSTANDING ANY OTHER PROVISIONS HEREIN CONTAINED TO THE CONTRARY."*

**45.** *Post* at 488.

**46.** *Woolsey v. Panhandle Ref. Co.,* 131 Tex. 449, 116 S.W.2d 675, 676 (1938) ("The law [the Workers' Compensation Act] is comprehensive in its terms....")

**47.** *Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 795–796 (Tex.2001) (Hecht, J., concurring) ("The hire for a subscribing independent contractor presumably includes the cost of providing workers' compensation coverage related to the work, and the contractor's employer who pays it should have the same protection from extra liability for job-related injuries to the contractor's employees that the contractor has. The employer thus has the same economic incentive the contractor has to minimize job-related risks

sent's only response is that whimsy is a legislative prerogative.

The Act, first passed in 1913, provides an injured worker guaranteed but limited wage and medical benefits quickly and without regard to fault, in exchange for which the worker foregoes common law damage claims against his employer.[48] Not long ago, we wrote: "The [A]ct, which was part of a nationwide compensation movement, was perceived to be in the best interests of both employers and employees." [49] Much earlier, we said:

> Workmen's compensation laws have become part of our public policy. The object of the laws was to do away with the issues of negligence, unavoidable accident, assumed risk, contributory negligence, and other like issues, and to fix the amount recoverable free of any un-

certainty. The old system of settling disputes was unsatisfactory, and modern business methods demanded that compensation for injuries to employees be not controlled by the fault or negligence of the employee, but should rest upon broader, more humane, and more certain rules.[50]

An owner-run jobsite is not uncommon. No one has suggested a reason why a general contractor who works for an owner can submit to the obligations and protections of the workers' compensation system as a statutory employer for all the workers on the job, while the owner himself cannot, other than to subvert the system. Of course, the Legislature needs no reason to differentiate between general contractors who do not own the jobsite and those who do. But we are required to presume that

to workers. The employer is not like a product manufacturer or other stranger to the work relationship who has not born any part of the cost of compensation and therefore is not immune from liability for injury to the contractor's employees. Imposing liability on the employer for the contractor's negligent injury of its employee is simply inconsistent with the 'bedrock principle' that workers' compensation is an employee's exclusive remedy and full compensation for job-related injuries." (footnotes omitted) (citing *Monk v. Virgin Is. Water & Power Auth.*, 53 F.3d 1381, 1392 (3d Cir.1995); *Anderson v. Marathon Petrol. Co.*, 801 F.2d 936, 941 (7th Cir. 1986))).

**48.** *Kroger Co. v. Keng*, 23 S.W.3d 347, 349–350 (Tex.2000) ("The Texas Legislature enacted the Act in 1913 in response to the needs of workers, who, despite escalating industrial accidents, were increasingly being denied recovery. The Act allowed injured workers, whose employers subscribed to workers' compensation insurance, to recover without establishing the employer's fault and without regard to the employee's negligence. In exchange, the employees received a lower, but more certain, recovery than would have been possible under the common law." (citation omitted)); *Texas Workers' Compensation Com'n v. Garcia*, 893 S.W.2d 504, 511 (Tex.

1995) ("Employees injured in the course and scope of employment could recover compensation without proving fault by the employer and without regard to their or their coworkers' negligence. In exchange, the employer's total liability for an injury was substantially limited." (citation omitted)); *Edmunds v. Highrise, Inc.* 715 S.W.2d 377, 379 (Tex.App.-Houston [1st Dist.] 1986, writ ref'd) ("The theory behind the exclusive remedy provision of the Workers' Compensation Act is that in cases where the employee is merely injured, he be given the opportunity to relinquish common law remedies for lesser benefits which are paid more quickly and efficiently, and without proof of fault.").

**49.** *Garcia*, 893 S.W.2d at 511; *see also Kernan v. American Dredging Co.*, 355 U.S. 426, 431–432, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958) ("[A]s industry and commerce became sufficiently strong to bear the burden, the law, the reflection of an evolving public policy, came to favor compensation of employees and their dependents for the losses occasioned by the inevitable deaths and injuries of industrial employment, thus shifting to industry the 'human overhead' of doing business. For most industries this change has been embodied in Workmen's Compensation Acts.").

**50.** *Woolsey,* 116 S.W.2d at 676.

the Legislature has acted reasonably,[51] and in any event, the statutory provisions at issue draw no such distinction. While their silence on the subject may be read either way, we should assume that the Legislature intended that the treatment of general contractors be consistent with the Act as a whole. For these reasons, I conclude that of the two constructions of the statutory text, both reasonable on their face, the Court's is stronger.

## IV

The argument is made, however, that the Legislature is not likely to have intended by its definition of "general contractor" to include a person who has work done on his own property because that would have been a major change in the law that would have drawn attention when in fact it was enacted without note. The Court followed the same line of reasoning in *Energy Service Co. of Bowie, Inc. v. Superior Snubbing Services, Inc.,*[52] where we construed an amendment to the statute governing the enforceability of indemnity agreements long used in the oil patch. The industry practice was well-settled, had never been criticized, and continued unchanged after the amendment. We concluded that "[a]bsent any identifiable reason for a substantive change to have been made in the statutory provision, or any extra-textual indication that one was intended, or any resulting change in industry practice, we think the most reasonable construction of [the amended statute] is the same as its ... predecessors."[53] The problem with the argument in this case is that it has never been clear when a person is considered the statutory employer of a subcontractor or his employees, liable to provide the workers' compensation benefits, and entitled to the exclusive remedy protection of the Act.

Before 1983, the only provision in the Workers' Compensation Act relating to coverage of a subcontractor was article 8307, section 6, which, as noted above, was enacted in 1917 and prohibited a subscriber from subcontracting work "with the purpose and intention" of avoiding the liability for workers' compensation benefits he would have if his own employees were injured doing the work.[54] In that situation, the subcontractor's injured employee was deemed to be the subscriber's employee and therefore entitled to compensation benefits.

In three consecutive legislative sessions beginning in 1977, six bills were introduced, the ostensible purpose of which was to eliminate section 6's subjective "purpose and intention" trigger and provide greater certainty in determining whether a subscriber should be treated as the statutory employer of his subcontractors and their employees. The premise of the bills was that subscribers were being treated as statutory employers already, but not always predictably or consistently. The bills proposed to amend or replace section 6 and provide, variously, either that coverage extended to subcontractors unless otherwise agreed, that coverage did not extend unless otherwise agreed, or something in between. In brief:

- HB 1584, introduced in 1977, would have amended section 6 and provided simply that "under a bona fide subcontract made in good faith", workers'

---

**51.** *See* Tex. Gov't Code § 311.021.

**52.** 236 S.W.3d 190 (Tex.2007).

**53.** *Id.* at 195.

**54.** Act approved Mar. 28, 1917, 35th Leg., R.S., ch. 103, § 1, Part II, § 6, 1917 Tex. Gen. Laws 269, 284–285, codified as Tex Rev Civ. Stat Ann art. 8307, § 6, text quoted *supra* note 40.

compensation coverage was not provided.[55] HB 1584 passed the House [56] but was left pending in the Senate committee.

- HB 1585, also introduced in 1977, would have replaced section 6 altogether and provided that a subscriber's coverage extended to subcontractors and their employees, absent an agreement to the contrary, unless they were already covered.[57] HB 1585 would also have provided that a subscriber could always agree to extend compensation coverage to a subcontractor and his employees and pass

the cost through to the subcontractor.[58] HB 1585 was not voted out of committee.

- In 1979, SB 360 was introduced, almost identical to HB 1584, but it was rewritten in committee and passed the Senate. The committee substitute deleted existing section 6 and provided instead that a prime contractor would not be deemed the employer of a subcontractor or his employees without an agreement beforehand, but absent such an agreement, the prime contractor would be required to provide coverage if the subcontractor did not do

55. Tex. H.B. 1584, 65th Leg., R.S. (1977).

56. As HB 1584 passed the House, it stated: "If any subscriber to this law sublets the whole or any part of the work to be performed or done by said subscriber to any subcontractor under a bona fide sub-contract made in good faith, then in the event the subcontractor or any employee of such sub-contractor sustains an injury in the course of his employment, he shall be deemed to be and taken for all purposes of this law not to be the employee of the subscriber. A sub-contractor, as that term is used in this Act, means a person, firm or corporation, or any other legal entity recognized under Texas law, contracting with the principal or prime contractor for the performance, in a capacity other than as an employee, of any and all work or services which such principal or prime contractor has contracted to perform."

57. Tex. H.B. 1585, 65th Leg., R.S. (1977) ("(a) As used in this Act, the term sub-contractor means a person, firm, corporation or any other legal entity recognized under Texas law, contracting with the principal, original or prime contractor for the performance of all or any part of the work or services which such principal, original or prime contractor has contracted to perform. (b) A sub-contractor and employees of the sub-contractor shall be deemed employees of the subscriber for which or for whom such sub-contractor is to perform work or services unless: (i) prior to beginning the performance of any work or services to be performed under such sub-contract, subscriber and sub-contractor have

entered into a bona fide written contract expressly providing that sub-contractor undertakes such work or services to be performed thereunder as an independent contractor and not as an employee of the subscriber; or, (ii) sub-contractor has provided workmen's compensation insurance coverages for sub-contractor's employees and/or the sub-contractor during the performance of the sub-contract as evidenced by certificates of insurance issued by sub-contractor's workmen's compensation insurance carrier.").

58. *Id.* ("(c) Notwithstanding any other provisions of this law, a subscriber may provide workmen's compensation insurance coverages for the sub-contractor's employees and/or the sub-contractor. In the event subscriber elects to provide such workmen's compensation insurance coverages, the insurance contract specifically shall include such subcontractor's employees and/or the sub-contractor, and the elected coverages shall continue while the subscriber's policy is in effect and while the named sub-contractor is endorsed thereon. The amount of the actual premiums paid or incurred by the subscriber for workmen's compensation insurance coverages on such sub-contractor's employees and/or the subcontractor shall constitute a legal claim by subscriber against sub-contractor and, having provided such workmen's compensation insurance, subscriber may deduct the amount of the actual premiums paid or incurred in providing such workmen's compensation insurance coverages from the sub-contract price or any other monies due the sub-contractor.").

so, and could pass the cost through to the subcontractor.[59] The House committee amended the bill, reverting to a version something like HB 1584, providing that a general contractor could not be deemed to employ a subcontractor or his employees without agreeing at the outset of the job to provide workers' compensation benefits to the subcontractor and his employees.[60] The cost could be passed through to the subcontractor. The committee substitute was tabled on the floor.

- In 1981, three bills were introduced, SB 629, HB 1662, and SB 1080, all essentially identical to the House committee substitute for SB 360 the prior session. None made it to the floor.

None of these bills defined a general contractor or distinguished between one who owned the jobsite and one who worked for the owner. All seemed to treat any subscriber who engaged a subcontractor as a general contractor, though none specifically said so. Nothing in any of the bills suggested that a subscriber who en-

---

**59.** Tex. S.B. 360, 66th Leg., R.S. (1979) ("(a) As used in this Act, the term 'subcontractor' means a person, firm, corporation, or any other legal entity recognized under Texas law, contracting with the principal, original, or prime contractor for the performance of all or any part of the work or services which such principal, original, or prime contractor has contracted to perform. (b) Neither the subcontractor nor the employees of the subcontractor shall be deemed employees of the principal, original, or prime contractor for whom such subcontractor is to perform work or services unless, prior to beginning the performance of any work or services to be performed under such subcontract, the subscriber and subcontractor have entered into a bona fide written contract expressly providing that the subcontractor or the employees of the subcontractor will perform such work or services as employees of the subscriber. (c) If no contract is made pursuant to Subsection (b) of this section, the original or prime contractor shall provide workers' compensation insurance coverage for the subcontractor's employees or the subcontractor. The amount of the actual premiums paid or incurred by the subscriber for workers' compensation insurance coverage on such subcontractor's employees or the subcontractor may be deducted from the subcontractor's price or any other money due the subcontractor. (d) In lieu of the foregoing, the subcontractor may provide workers' compensation insurance coverages for the subcontractor's employees or the subcontractor during the performance of the subcontract as evidenced by certificates of insurance issued by subcontractor's workers' compensation insurance carrier and filed with the subscriber.").

**60.** The committee substitute read:

"(a) As used in this Act, the term sub-contractor means a person, firm, corporation or any other legal entity recognized under Texas law, contracting with the principal, original or prime contractor for the performance of all or any part of the work or services which such principal, original or prime contractor has contracted to perform.

"(b) Neither the sub-contractor nor the employees of the subcontractor shall be deemed employees of the principal, original or prime contractor for whom such sub-contractor is to perform work or services unless, prior to beginning the performance of any work or services to be performed under such sub-contract, subscriber and subcontractor have entered into a bona fide written contract expressly providing that the subscriber shall provide workers' compensation benefits to the sub-contractor or the employees of the sub-contractor while performing such work or services as if they were direct employees of the subscriber. The amount of the actual premiums paid or incurred by the subscriber for workers' compensation insurance coverage on such sub-contractor or the employees of the sub-contractor may be deducted from the contract price or any other monies due the sub-contractor.

"(c) If no contract is made pursuant to subsection (b) hereof, neither the sub-contractor nor the employees of the sub-contractor shall be deemed employees of the principal, original or prime contractor for whom such sub-contractor is to perform work or services."

gaged a subcontractor either could not or should not be allowed to extend coverage to a subcontractor and his employees and thereby become their statutory employer, with the benefit of the exclusive remedy protection.

In 1983, HB 1852 as introduced, like the bills the prior session, would have deleted existing section 6 and provided that a prime contractor's workers' compensation insurance coverage would not extend to a subcontractor or his employees except by agreement.[61] But the bill was amended in the House and Senate to restore existing section 6, redesignated 6(d), delete the sentence precluding a prime contractor from being deemed the statutory employer of a subcontractor and his employees, and provide that a prime contractor could agree to extend coverage to a subcontractor and his employees, passing the cost through to the subcontractor. As thus amended, the bill was enacted. The new section 6 had four paragraphs. Section 6(d) retained the 1917 text of section 6, providing that any subscriber who tried to avoid covering a subcontractor's employees would be deemed to be their employer for compensation purposes.[62] Section 6(a) expressly recognized that a prime contractor could agree to extend coverage to a subcontractor and his employees.[63] Section 6(c) defined "prime contractor" for the first time as follows:

**61.** Tex. H.B. 1852, 68th Leg., R.S. (1983) ("(a) a subcontractor and the employees of a subcontractor shall not be deemed to be employees of a prime contractor for whom such subcontractor is to perform work or services and there shall be no obligation on the part of a prime contractor for the payment to a subcontractor or to the employees of a subcontractor of workers' compensation under this law. A subcontractor and prime contractor may include in their written contract for the performance of work or services an agreement that the prime contractor will provide workers' compensation benefits to the subcontractor and to employees of the subcontractor. The amount of the actual premiums paid or incurred by the prime contractor for workers' compensation insurance coverage for the subcontractor and employees of the subcontractor may be deducted from the contract price or any other monies owed to the subcontractor by the prime contractor. (b) the term "subcontractor" means a person who has contracted to perform all or any part of the work or services which a prime contractor has contracted with another party to perform. (c) the term "prime contractor" includes "principal contractor" or "original contractor" and means the person who has undertaken to procure the performance of work or services and in connection therewith may engage subcontractors to perform all or any part of the work or services.").

**62.** TEX.REV.CIV. STAT. ANN. art. 8307, § 6(d) ("If any subscriber to this law with the purpose and intention of avoiding any liability imposed by its terms sublets the whole or any part of the work to be performed or done by said subscriber to any sub-contractor, then in the event any employe of such sub-contractor sustains an injury in the course of his employment he shall be deemed to be and taken for all purposes of this law to be the employe of the subscriber, and in addition thereto such employe shall have an independent right of action against such sub-contractor, which shall in no way be affected by any compensation to be received by him under the provisions of this law.").

**63.** *Id.* § 6(a) ("A subcontractor and prime contractor may make a written contract whereby the prime contractor will provide workers' compensation benefits to the subcontractor and to employees of the sub-contractor. Notwithstanding the provisions of Section 12(g), Article 8306, Revised Statutes, the contract may provide that the actual premiums (based on payroll) paid or incurred by the prime contractor for workers' compensation insurance coverage for the sub-contractor and employees of the sub-contractor may be deducted from the contract price or any other monies owed to the sub-contractor by the prime contractor. In any such contract, the sub-contractor and his employees shall be considered employees of the prime contractor only for purposes of the workers' compensation laws of this state (Article 8306, Revised Statutes, et seq.) and for no other purpose.").

The term "prime contractor" includes "principal contractor," "original contractor," or "general contractor" as those terms are commonly used and means the person who has undertaken to procure the performance of work or services. The prime contractor may engage subcontractors to perform all or any part of the work or services.[64]

And section 6(b) defined "subcontractor" to mean "a person who has contracted to perform all or any part of the work or services which a prime contractor has contracted with another party to perform."[65]

By referring to a prime contractor as someone who works for another, the definition of "subcontractor" would exclude an owner. But if the meaning of "prime contractor" defined in section 6(c) is to be informed by the definition of "subcontractor" in section 6(b), it must also be informed by section 6(d), which refers to the person who engages a subcontractor as a subscriber, a term that includes an owner acting as his own general contractor. Section 6(d) applies to all subscribers. If sections 6(a)-(c) were read to address only the situation in which the subscriber and prime contractor is not the owner, no ambiguity in the meaning of "prime contractor" would exist. Section 6(d) would have general application, while the other sections would not. The effect of HB 1852 was to provide greater certainty in one area, even if a comprehensive solution remained beyond reach. But if sections 6(a)-(c) were also of general application and prescribed the requirements for considering any prime contractor to be the statutory employer of subcontractors and their employees, then the ambiguity in the meaning of "prime contractor" would be unavoidable. Moreover, that construction of the statute would raise the question why a prime contractor who owns the jobsite should, like all other prime contractors, be prohibited from trying to avoid liability for workers' compensation benefits, but unlike all other prime contractors, not be allowed to provide such benefits.

In any event, the law regarding statutory employers was not clear before 1983, as evidenced by the variety of efforts to clarify it, and it was not much clearer after 1983.[66] HB 1852, as introduced, amended, and finally enacted, like the six bills in the prior three sessions, never suggested that statutory authorization previously lacking was required for prime contractors to extend workers' compensation coverage to subcontractors and their employees. On the contrary, the one consistent theme in all the bills was the need to clarify *when* coverage was extended, not *whether* it could be. HB 1852, like the others, never attempted to distinguish premises owners from prime contractors, and the definition of "prime contractor" finally enacted could reasonably be read to include a premises owner acting as his own general contractor.

I do not mean to suggest for a moment that the drafting history of the 1983 statute is relevant in determining the Legislature's intent by enacting it. The various bills and amendments do not reveal even the sponsors intentions, let alone the Legislature's. But the history of the legisla-

---

**64.** *Id.* § 6(c).

**65.** *Id.* § 6(b).

**66.** We have been cited only two cases that have considered whether a jobsite owner can be the statutory employer of subcontractors and their employees. One answered no, but only in dicta, *Williams v. Brown & Root, Inc.,* 947 S.W.2d 673, 677 (Tex.App.-Texarkana 1997, no writ), and the Court's opinion explains why it is not persuasive. The other also answered no, but involved a prior version of the statute at issue. *Wilkerson v. Monsanto Co.,* 782 F.Supp. 1187 (E.D.Tex.1991).

tion does effectively rebut the argument that the law regarding the extension of workers' compensation coverage to subcontractors and their employees was clear in 1983, and that allowing a person to be the statutory employer of subcontractors working on his property was so significant a change in 1989 that it would not have occurred without comment. The history of the legislation clearly shows that existing law was at all times unclear.

Thus, the argument that the 1989 change in the definition of "subcontractor" was not substantive because it was made without comment could be correct, but it is not clear what the law was before the change. The 1983 definition referred to "work or services which a prime contractor has contracted with another party to perform". The 1989 definition referred to "work or services which a prime contractor has undertaken to perform". The dissent argues that the Legislature used "undertaken" to mean the same thing as "contracted with another party", but it is just as likely that the Legislature used "undertaken" because it was more accurate and removed an ambiguity in the 1983 statute. The point is that the argument that the 1989 change was not substantive because it was not controversial proves nothing because the backdrop against which it appeared was itself unclear.

Finally, a number of bills introduced between 1995 and 2005 would have clarified who is a statutory employer on construction jobsites.[67] The Court explains why failed bills are not indicative of legislative intent. I would also point out that the fact that six bills failed in three sessions before 1983 did not indicate a legislative intent that HB 1852 not be the law.

\* \* \*

Respondent and the amici curiae that support his position argue that the statutory construction urged by petitioner is bad policy. We have no way to judge such matters and do not do so. Underlying many of their arguments is a conviction that the workers' compensation system is basically unfair. That issue also is not ours to judge. We must presume that the system is just and reasonable.[68] The Court's construction of the statutory provisions at issue is most consistent with that system.

Justice WILLETT filed a concurring opinion.

Justice WILLETT, concurring.

In times of political rancor, vengeful motives are swiftly attributed (and swiftly believed). This is unfortunate, but also unaffecting. The judiciary, rightly understood, is not a political institution but a legal one, meaning we must decide cases on the basis of principled legal points, not political talking points.

This appeal constitutes something of a legal Rorschach test: People see in it what they wish, and one person's commendable restraint is another's condemnable activism. Here, one side (Entergy) contends that judicial restraint requires a plain-language reading of the statute, that the surest manifestation of legislative will is found in legislative text. The other side (Sum-

---

67. Tex. H.B. 2279, 74th Leg., R.S. (1995); Tex. H.B. 2630, 75th Leg., R.S. (1997); Tex. H.B. 3024, 75th Leg., R.S. (1997); Tex. S.B. 1404, 76th Leg., R.S. (1999); Tex. H.B. 3120, 77th Leg., R.S. (2001); Tex. H.B. 3459, 77th Leg., R.S. (2001); Tex. H.B. 2982, 78th Leg., R.S. (2003); Tex. S.B. 675, 78th Leg., R.S. (2003); Tex. H.B. 1626, 79th Leg., R.S. (2005).

68. *See* Tex Gov't Code § 311.021 ("In enacting a statute, it is presumed that . . . (3) a just and reasonable result is intended. . . .").

mers) brands such a reading judicial activism, that gleaning intent demands a more holistic and embellished approach.

My view is uncomplicated: The law begins with language, and it smacks of Lewis Carroll when critics, voices raised high in derision, inveigh against "judicial activism" because judges refrain from rewriting the text lawmakers chose. This side of the looking glass, reading a statute as enacted is the nadir of activism, not its zenith. It must be stressed that even one of Summers' amicus supporters concedes the statute can be read in Entergy's favor [1]—a result that, sound and fury aside, "will probably not have a substantial impact on the workers' compensation system as a whole." [2]

I agree with the Court's bottom-line result (and a good deal, though not all, of its analysis), but I write separately because this case raises important issues regarding statutory construction, and the judicial role more generally, that deserve fuller, more head-on treatment.

## I. Introduction—Whether Entergy Can Qualify As a "General Contractor"

Today's issue is simply stated but sharply disputed: Can a premises owner qualify as a "general contractor" under the Texas Workers' Compensation Act? Amid the spirited debate, two preliminary matters are unchallenged: (1) premises owners who provide workers' compensation insurance coverage to their own employees are statutorily immune from tort suits over work-related injuries; and (2) general contractors who cover their subcontractors' employees are also immune. Today's case presents a hybrid—whether a premises owner can serve as its own general contractor and assert the same exclusive-remedy defense as a contract employer that it asserts as a direct employer.

Consider: Two employees working side by side at a company-owned workplace, performing the same work when the same accident inflicts the same injuries. One worker is the company's direct employee, the other its contract employee, both having voluntarily elected coverage under the same written, owner-provided workers' compensation policy. If the owner meets the Legislature's elastic definition of "general contractor"—written solely in terms of what contractors *do*, not what they *own*—then its contract employees are bound by the same agreed-to policy that binds its direct employees. Ownership nowhere proscribes what the Act prescribes.

Two things should drive our analysis—the Legislature's language, which is open-ended, and this Court's role, which is not. We must respect policy-laden statutes as written and give wide leeway to the innumerable trade-offs reflected therein. The Act's definition of "general contractor" is sweeping ("a person who undertakes to procure the performance of work") and carves out only one narrow exclusion ("a motor carrier that provides a transportation service through the use of an owner operator"). The wording is inclusive in

---

1. Written Testimony of the Texas Association of Defense Counsel: Hearing on Interim Charge Number Eight Before the Senate State Affairs Comm., 80th Leg., Interim (April 28, 2008).

2. According to legislative testimony from this pro-Summers amicus:

> Whatever decision the court ultimately makes in the *Entergy* case will probably not have a substantial impact on the workers' compensation system as a whole. . . . [O]nly relatively large owners or contractors can afford to administer the kinds of insurance programs involved in the case, so we do not expect a sudden shift in this direction.
> *Id.*

general but exclusive in particular. The pre–1989 Act used a similarly broad definition (with no exclusion) but a companion definition suggested a premises owner could not serve as its own general contractor. Significantly, the Legislature deleted that explicit dual-hat reference in 1989 as part of a substantive overhaul. Today's Act does not deny the exclusive-remedy defense if the person who procures the work and provides the coverage—the two factors that define "statutory employer"—also owns the jobsite.

I agree with the Court. By "undertak[ing] to procure the performance of work," Entergy meets the Legislature's brief-but-broad definition. This, coupled with Entergy's provision of workers' comp coverage, confers statutory-employer status.

## II. The Legislature's Chosen Words Dictate the Outcome

The Act's controlling provisions are straightforward:

- *"General contractor"*: Any "person who undertakes to procure the performance of work or a service, either separately or through the use of subcontractors. The term includes a 'principal contractor,' 'original contractor,' 'prime contractor,' or other analogous term." [3]
- *"Subcontractor"*: Any "person who contracts with a general contractor to perform all or part of the work or

services that the general contractor has undertaken to perform." [4]
- *Statutory employer:* A general contractor "may enter into a written agreement [with a subcontractor] under which the general contractor provides workers' compensation" coverage to the subcontractor and the subcontractor's employees,[5] and such an agreement "makes the general contractor the employer of the subcontractor and the subcontractor's employees ... for purposes of the workers' compensation laws." [6]
- *Exclusive remedy:* Workers' compensation benefits are a covered employee's "exclusive remedy" against an employer for work-related injuries.[7]

### A. Legislative intent is revealed by legislative language

There is one building-block principle this Court has declared repeatedly and emphatically: the "surest guide" to what lawmakers intended is what lawmakers enacted.[8] We are interpreting words, and where those words are not doubtful, even though their wisdom may be, we are bound to honor them. Accordingly, since intent is driven by text, we must not accept the peculiar view that construing the Act's definition of "general contractor" by its terms would subvert legislative intent.[9] Indeed, it is displacing the concreteness of what was actually said with the conjecture of what was allegedly meant that invites ac-

---

**3.** Tex. Lab.Code § 406.121(1).

**4.** *Id.* § 406.121(5).

**5.** *Id.* § 406.123(a).

**6.** *Id.* § 406.123(e).

**7.** *Id.* § 408.001(a).

**8.** *Leland v. Brandal,* 257 S.W.3d 204, 206 (Tex.2008) (quoting *Fitzgerald v. Advanced*

*Spine Fixation Sys.,* 996 S.W.2d 864, 866 (Tex.1999)).

**9.** Many observers, including lawyers, often conflate legislative intent with legislative history. They are distinct. Under our cases, determining intent is the objective, and where text is clear, text is determinative. Legislative history is a device some judges use to discern intent when text is unclear.

tivism, a mischievous way for courts to put a finger on the scale (or in the wind) and thus substitute judicial intent for legislative intent. Our place in the constitutional architecture requires fidelity to what lawmakers actually passed.

Consequently, we must focus on what a statute says and, just as attentively, on what it does not say, taking care to honor substantive changes, both additions and deletions, made over the years, and always presuming that the Legislature chose its language carefully.[10] As for what the Act *includes*, its definition of "general contractor" is notable for two things: (1) a solitary description ("undertakes to procure the performance of work"), including a non-exhaustive list of synonyms (" 'principal contractor,' 'original contractor,' 'prime contractor,' or other analogous term"); and (2) a solitary exclusion ("a motor carrier that provides a transportation service through the use of an owner operator"). Any entity that falls inside the former and outside the latter is shielded from tort liability if it provides workers' compensation coverage to its contractors' employees. As for what the Act *excludes*, we must give effect to the Legislature's deletion in 1989 of a provision ("contracted with another party") that contemplated a general contractor contracting upstream with a premises owner.

## B. The court of appeals disregarded the Act's key provisions

### 1. *it ignored the specific definition of "general contractor"*

The court of appeals held "Entergy did not establish it had undertaken to perform work or services and then subcontracted part of that work to IMC, as a general contractor would have done."[11] To reach this conclusion, the court relied on *Williams v. Brown & Root, Inc.*, a 1997 court of appeals decision stating that "[a] general contractor is any person who contracts directly with the owner."[12] The *Williams* court reasoned an entity that "did not contract with the owner, but instead was the owner" arguably fell outside the definition.[13] The *Williams* court, as the Court today notes,[14] committed a fundamental error, disregarding the Labor Code's specific definition of "general contractor"[15] in favor of a more generic definition.[16] The Legislature often supplies its own dictionary, and where it provides a precise definition, courts must honor that substituted meaning.[17] Importantly, this admonition holds true even if the Legislature's technical definition departs from the term's ordinary meaning.[18] So while a general contractor may *ordinarily* be thought to contract with the premises own-

10. *See Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex.1981); *Eddins–Walcher Butane Co. v. Calvert*, 156 Tex. 587, 298 S.W.2d 93, 96 (1957).

11. 282 S.W.3d 513.

12. *Id.* (quoting *Williams v. Brown & Root, Inc.*, 947 S.W.2d 673, 677 (Tex.App.-Texarkana 1997, no writ)) (internal quotation marks omitted) (alteration in original).

13. *Williams*, 947 S.W.2d at 677.

14. 947 S.W.2d 673.

15. The *Williams* court quoted the then-applicable statutory definition of "general contractor," 947 S.W.2d at 676, which is virtually identical to the current definition.

16. *Id.* at 677 ("A general contractor is any person who contracts directly with the owner, the phrase not being limited to one undertaking to complete every part of the work.") (quoting 17 C.J.S. *Contracts* § 11 (1963)) (internal quotations omitted).

17. Tex. Gov't Code § 311.011(b).

18. *See Tijerina v. City of Tyler*, 846 S.W.2d 825, 827 (Tex.1992).

er—even though, as the Court observes, an owner serving as its own general contractor is "by no means uncommon"[19]—that construction must give way to the Act's specific definitions.[20]

Contrary to the suggestion in *Williams* that an owner cannot double as a general contractor because it cannot contract with itself, the statute does not blanketly exclude premises owners who otherwise meet the Act's undemanding criteria.[21] Nothing in the Act dictates that a premises owner who procures the work and provides the coverage, the only two factors that confer statutory-employer status, lack the same comp-bar immunity granted someone who performs the very same actions but lacks title to the worksite.[22]

The legal test for determining whether Entergy can invoke the exclusive-remedy defense is not whether the statute explicitly includes "owners." The test is a simple one: Does Entergy meet Chapter 406's eligibility criteria? The record shows clearly that Entergy "[undertook] to procure the performance of work" from IMC.[23] Deposition testimony established that Entergy hired IMC to "supplement the Entergy employee workforce" and help perform maintenance, including "water and turbine-related, generator-related work," at its Sabine plant. Summers' own summary-judgment response concedes that Entergy "entered into a contract with [IMC] for IMC to perform various maintenance work at Entergy's plant in Bridge City, Texas." Entergy undeniably "un-

**19.** 282 S.W.3d 433.

**20.** The 1983–1989 definition of "prime contractor" made clear it was using the term, and similar terms, "as those terms are commonly used." *See* Act of May 28, 1983, 68th Leg., R.S., ch. 950, § 1, sec. 6(c), 1983 Tex. Gen. Laws 5210, 5210 *amended by* Act of Dec. 12, 1989, 71st Leg., 2d C.S., ch. 1, § 3.05(a)(2), 1989 Tex. Gen. Laws 1, 15. This "commonly used" admonition was deleted during the 1989 rewrite, and the current Act uses "or other analogous term." Tex. Lab Code § 406.121(1).

**21.** *See* Tex. Lab.Code § 406.121(1).

**22.** The Court is not alone in holding that a premises owner can act as its own general contractor for purposes of a workers' compensation statute. The Supreme Court of Tennessee in *Brown v. Canterbury Corp.*, 844 S.W.2d 134 (Tenn.1992), considered whether an owner may nonetheless qualify as a principal contractor under the Tennessee workers' compensation statute (which like ours does not mention "owner"). *See* Tenn.Code Ann. § 50-6-113. The court acknowledged that earlier cases "created a distinction between an owner of property and a general contractor, holding that an entity could be considered a principal contractor within the meaning of the workers' compensation act only if it per-

formed work 'for another.'" *Brown*, 844 S.W.2d at 137. The court rejected these older cases, noting that "more recent decisions" allowed an owner to act as its own principal contractor. *Id.* Tennessee revisited the issue more recently in *Rucker v. Rockwood Electric Utilities*, No. 03S01–9511–CH–00127, 1996 WL 626292, at *3 (Tenn. Oct.30, 1996) (not designated for publication). Pursuant to Tennessee Supreme Court Rule 4(A)(3), an opinion of the Special Workers' Compensation Appeals Panel is not published unless a majority of the Tennessee Supreme Court votes for it to be published. In that case, the Special Workers' Compensation Appeals Panel of the Supreme Court found that Rockwood Electric Utilities, an owner, was acting as a statutory employer. *Id.* The Panel relied on an earlier Tennessee Supreme Court opinion that specifically rejected a third-party requirement. *Id.* (citing *Stratton v. United Inter–Mountain Tel. Co.*, 695 S.W.2d 947 (Tenn.1985)). Similarly, the Supreme Court of Florida recognizes that a premises owner is entitled to comp-bar immunity "where an owner assumes the role of contractor and employer and, consequently, the duty to provide workers' compensation benefits." *Ramos v. Univision Holdings, Inc.*, 655 So.2d 89, 90 (Fla.1995).

**23.** "Procure" means "to obtain by care or effort, to acquire." Oxford American Dictionary 533 (1980).

der[took] to procure the performance of work," thus meeting the Act's broad definition, and because it also provided the workers' compensation policy under which Summers recovered, Entergy is his statutory employer.

## 2. *it utilized a long-discarded definition of "subcontractor"*

The court of appeals in this case (and the *Williams* court) also erred in relying on *Wilkerson v. Monsanto Co.*, a federal district court decision holding that a premises owner cannot be a statutory employer (because it cannot be a general contractor).[24] Here, too, the mistake concerns a misused statutory definition. *Wilkerson*, unlike today's case, was governed by the pre–1989 definition of "subcontractor": "a person who has contracted to perform all or any part of the work or services which a

prime contractor has *contracted with another party* to perform."[25] The *Wilkerson* court interpreted "contracted with another party" to mean the prime contractor and premises owner must be distinct entities.[26] The court said this phrase, the law from 1983 until 1989,[27] meant a general contractor was necessarily an intermediary that contracts both upstream with the premises owner and downstream with the subcontractor. As the owner's contracts in *Wilkerson* were all downstream, he could not be a statutory employer.[28]

Assuming *Wilkerson* was correctly decided, it lacks any interpretive force today, for a simple reason: *Wilkerson* turned entirely on four words the Legislature removed during its 1989 substantive rewrite.[29] Here are the pre- and post-overhaul definitions that, construed together, control our decision:

| | prime/general contractor | subcontractor |
| --- | --- | --- |
| pre-1989 | "the person who has undertaken to procure the performance of work or services" and " 'prime contractor' includes 'principal contractor,' 'original contractor,' or 'general contractor' as those terms are commonly used"[30] | "a person who has contracted to perform all or any part of the work or services which a prime contractor has contracted with another party to perform"[31] |

24. 782 F.Supp. 1187, 1188 (E.D.Tex.1991).

25. *Id.* at 1189 (emphasis added) (relying on Act of May 28, 1983, 68th Leg., R.S., ch. 950, § 1, sec. 6(b), 1983 Tex. Gen. Laws 5210, 5210 (previously codified at Tex.Rev.Civ. Stat. art. 8308–3.05)).

26. *Id.* at 1188–89.

27. Act of May 28, 1983, 68th Leg., R.S., ch. 950, § 1, sec. 6(b), 1983 Tex. Gen. Laws 5210, 5210 *amended by* Act of Dec. 12, 1989, 71st Leg., 2d C.S., ch. 1, sec. 3.05(a)(5), 1989 Tex. Gen. Laws 1, 15, *codified as* Tex. Lab.Code § 406.121(5).

28. Another distinction between *Wilkerson* and this case: In *Wilkerson*, the contract between the owner and the plaintiff's direct employer affirmatively disclaimed any employment re-

lationship between the owner and the contractor's employees, 782 F.Supp. at 1188, while in this case, the contract language explicitly identifies Entergy as the "principal employer" and reserves to Entergy the right to assert statutory-employer status against contract employees' personal-injury suits.

29. *See* Act of May 28, 1983, 68th Leg. R.S., ch. 950, § 1, sec. 6(b), 1983 Tex. Gen. Laws 5210, 5210 (amended 1989).

30. *See* Act of May 28, 1983, 68th Leg. R.S., ch. 950, § 1, sec. 6(c), 1983 Tex. Gen. Laws 5210, 5210, *amended by* Act of Dec. 12, 1989, 71st Leg., 2d C.S., ch. 1, sec. 3.05(a)(2), 1989 Tex. Gen. Laws 1, 15.

31. *See* Act of May 28, 1983, 68th Leg., R.S., ch. 950, § 1, sec. 6(b), 1983 Tex. Gen. Laws 5210, 5210 (amended 1989).

| | | |
|---|---|---|
| current | "a person who undertakes to procure the performance of work or a service. . . . The term includes a 'principal contractor,' 'original contractor,' 'prime contractor,' or other analogous term. The term does not include a motor carrier that provides a transportation service through the use of an owner operator" [32] | "a person who contracts with a general contractor to perform all or part of the work or services that the general contractor has undertaken to perform" [33] |
| key change | current definition excludes a single class of otherwise eligible persons: certain motor carriers, nobody else | current definition no longer imposes an "upstream contract" condition on general contractors |

As seen above, the 1989 reform bill deleted "contracted with another party," the critical upstream-contract phrase that anchored *Wilkerson* and suggested a premises owner could not wear the hat of general contractor. The before-and-after comparison is difficult to brush aside. While the 1983–1989 Act indicated that a contractor undertook action on behalf of someone else (the owner), the Legislature in 1989 removed that upstream inference. Our cases require us to treat such omissions as meaningful and not meaningless,[34] a principle even more prudent when deletions occur, as here, within a substantive overhaul that constitutes the lone piece of legislation that lawmakers are considering.[35] *Wilkerson* remains instructive only to underscore that statutory construction must honor statutory definitions.

Summers urges a construction rooted in now-repealed language. While conceding that "contracted with another party" appears nowhere in the current statute, Summers insists the upstream-contract notion was not deleted but transplanted, subsumed now by the phrase "undertakes to procure" in the definition of "general contractor." This contention—that the upstream-contract condition was moved but not removed—is facially counterfactual, betrayed by this inconvenient truth: "undertake[ ] to procure" also appeared in the pre–1989 definition. Even though this phrase predated the 1989 overhaul, Summers argues it became implicitly freighted with what was once explicitly stated (in a different definition). This argument is unpersuasive. Updated criteria require updated analysis. It is untenable that the four words so important in *Wilkerson* were, though deleted, imported into three words that predated *Wilkerson*. Summers' argument would reinsert what lawmakers took out and declare this part of a massive modernization bill—the part that anchors the precedent upon which Sum-

**32.** Tex. Lab.Code § 406.121(1).

**33.** *Id.* § 406.121(5). Today's definition of "subcontractor" was tweaked slightly (and nonsubstantively) as part of the 1993 codification of the Labor Code. Act of May 12, 1993, 73rd Leg., R.S., ch. 269, § 1, sec. 406.121(5), 1993 Tex. Gen. Laws 987, 1158. It is derived almost verbatim from the 1989 overhaul's definition. Act of Dec. 12, 1989, 71st Leg., 2d C.S., ch. 1, § 3.05(a)(5), 1989 Tex. Gen. Laws 1, 15.

**34.** *See In re Ament,* 890 S.W.2d 39, 41 (Tex. 1994) (per curiam); *Cameron v. Terrell & Gar-* *rett, Inc.,* 618 S.W.2d 535, 540 (Tex.1981). In a sense, Entergy hired IMC to help Entergy fulfill an upstream obligation, a statutory one at that: to "furnish service, instrumentalities, and facilities that are safe, adequate, efficient, and reasonable." *See* Tex. Util.Code § 38.001.

**35.** We presume that lawmakers enact statutes "with complete knowledge of the existing law and with reference to it," *Acker v. Texas Water Com'n,* 790 S.W.2d 299, 301 (Tex.1990), and that any omissions are intentional, *Cameron,* 618 S.W.2d at 540.

mers relies most—wholly nonsubstantive and merely aesthetic.[36]

We cannot treat the upstream-contract language in the 1983–1989 Act as mere surplusage and its 1989 deletion a nullity. Nor does the dissent pivot on Summers' argument that "undertakes to procure" necessarily implies an upstream obligation and must be read as "undertakes to procure *for someone else.*" The deletion of something explicit means more than the retention of something implicit. Indeed, several Texas statutes use "undertake" to

describe a person acting to benefit himself.[37] More to the point, when lawmakers have in mind an entity doing something on another's behalf, they have no difficulty saying so explicitly, often using "undertakes" in tandem with clear third-party language like "for another person."[38] In such instances, including elsewhere in the Labor Code, the Legislature has done more than imply a third-party obligation; it has stated one outright, something lawmakers in 1989 did not do, instead choosing to scrap preexisting third-party language.[39]

**36.** One amicus, citing the Sherlock Holmes story of the dog that did not bark, Sir Arthur Conan Doyle, *Silver Blaze*, The Memoirs of Sherlock Holmes (1894), argues it is more likely the Legislature intended to change a statute by *adding* words than by *deleting* them: "That is because the deletion of words is more likely to have been done by mistake and deletions are more difficult for legislators to recognize during the legislative process than added words." Unlike Holmes, we are not studying the import of conspicuous silence, but the import of conspicuous deletion. The Legislature in 1989 affirmatively removed words indicating an upstream contract. It may well be true, as the amicus asserts, that "omitted language is less likely to come to the consciousness of legislators in the often chaotic process of legislating," but chaotic or not, Texas law requires us to accept that lawmakers acted intentionally, not inadvertently. However clamorous the Capitol was in 1989, our cases forbid any presumption that the Legislature was inattentive.

**37.** *See, e.g.,* Tex. Agric. Code § 12.040(d)(3)(C) ("a long-term plan outlining the steps the community will undertake to maintain its desirability...."); Tex. Ins.Code § 751.002(b) ("... the department or commissioner ... may undertake market analysis or market conduct action...."); Tex. Loc. Gov't Code § 232.093(e) ("Before a planning commission member undertakes the duties of the office...."); Tex. Transp. Code § 454.001(b)(1) ("A municipality ... may undertake research, development, and demonstration projects...."); Tex. Util.Code § 52.256(b)(3) ("... the telecommunications utility will un-

dertake to achieve each of these initiatives....").

**38.** *See, e.g.,* Tex. Occ.Code § 1702.108 ("A person acts as a guard company ... if the person ... undertakes to provide ... for another person...."); Tex. Local Gov't Code § 176.001(1) (" 'Agent' means a third party who undertakes ... for another person...."); Tex. Gov't Code § 27.006(a)(1) ("A justice commits an offense if the justice: ... undertakes ... for another...."); Tex. Lab Code § 21.002(9)(A) (" 'Employment Agency' means a person ... who regularly undertakes ... to procure: (A) employees for an employer....").

**39.** Summers and some of his aligned amici advance a safety-related argument, predicting the "complete destruction of the incentive to make the workplaces safe" if Summers loses. But whether one scheme promotes workplace safety over the other is a legislative call, not ours. In any case, the record shows that Entergy employees work alongside IMC employees, and the Act gives those protected by the exclusive-remedy defense concrete incentives to minimize job-related risks. *See* Tex. Ins.Code. §§ 2053.001–.054; *Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 795 (Tex.2001) (Hecht, J., concurring) (a contractor's employer "has the same economic incentive the contractor has to minimize job-related risks to workers"). Premiums are tied to accident records, and rates are higher for unsafe employers. Also, regulations from the Occupational Safety and Health Administration cover Entergy's direct workers just as fully as they cover Entergy's contract workers. *See* 29 U.S.C. § 654. Finally, nothing in

The Act as written bars Summers' claim, and it merits mention that even certain counsel supporting Summers concede the statutory text can be read in Entergy's favor: "Based on statutory language alone, reasonable persons may differ on whether a premises owner may also act as a general contractor in the procurement of work and provision of workers' compensation coverage, thus receiving the exclusive remedy protection from third party actions."[40] Thus, we are directed to arguments that look beyond the statute itself.

## III. Settled Precedent Bars Summers' Extratextual Arguments

Summers and his aligned amici contend that several factors outside the Act's actual language support a more flexible statutory reading. The Court correctly rejects these arguments, and notably the dissent implicitly does likewise.

### A. Failed bills predating and postdating the Act's 1989 overhaul carry no interpretive force

Summers and various amici exhort us to construe language that passed in light of language that failed to pass. As the Court makes clear, we cannot. Precedent from both the United States Supreme Court and from this Court counsel against supplanting unequivocal enacted text with equivocal unenacted inferences drawn from failed legislation.

First, counsel supporting Summers direct us to the 1989 overhaul effort itself. It is undisputed that the 71st Legislature was consumed with the task of restructuring the State's then–76–year–old workers' compensation system.[41] The regular 140–day session failed to produce a reform bill, and Governor Clements immediately called a special session. Summers places great weight on the fact that during this first of two special sessions, House members once considered an omnibus bill that used "owner or general contractor" in section 406.123's predecessor. House–Senate negotiations collapsed, reportedly over two unrelated issues,[42] and lawmakers adjourned and went home for several months. Later that year, Governor Clements called a second special session, and in its final hours the Legislature passed Senate Bill 1, which did not expressly include the word "owner," a fact Summers views as dispositive.

This argument is unavailing, as the United States Supreme Court recently explained: "It is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process."[43] The word's momentary presence during Special Session No. 1 and absence several months later during Special Session No. 2 suggests nothing that can override the express terms of the en-

---

the record suggests the exclusive-remedy defense has spurred employers to care less about preventing jobsite accidents than those who face common-law liability.

40. Written Testimony of the Texas Association of Defense Counsel: Hearing on Interim Charge Number Eight Before the Senate State Affairs Comm., 80th Leg., Interim (April 28, 2008).

41. *See* Jill Williford, Comment, *Reformers' Regress: The 1991 Texas Workers' Compensation*

*Act*, 22 ST. MARY'S L.J. 1111, 1124–25 (1991).

42. *See* JOHN T. MONTFORD ET AL., A GUIDE TO TEXAS WORKERS' COMP REFORM 3 (1991) (reporting that conferees agreed on fourteen of sixteen chapters in the bill, "but there were colossal differences in the dispute resolution and benefits proposals").

43. *District of Columbia v. Heller*, —— U.S. ——, ——, 128 S.Ct. 2783, 2796, 171 L.Ed.2d 637 (2008).

acted statute.[44] Under Summers' position, we must assign great meaning to never-enacted language ("owner") that appeared in a prior session's bill draft but no meaning to once-enacted language ("contracted with another party") that the Legislature affirmatively removed from an on-the-books statute. We cannot bestow all significance on proposed alterations in failed bills while ignoring enacted alterations to the statute itself. Settled law requires the opposite approach, respecting changes to actual statutes and discounting changes to would-be statutes.

Second, counsel supporting Summers ask us to examine post–1989 legislative efforts and conclude that intent to bar premises owners from invoking statutory-employer immunity is implicit in the Legislature's consideration, but not adoption, of various bills since 1989 related to premises-owner liability.[45] Summers sees the failure of these measures as tantamount to a legislative command to exclude premises

owners from asserting the exclusive-remedy defense.

We cannot draw such an inference for two reasons. First, the Act itself controls, and its definitions include no such exclusion. Far more probative than proposed legislation is passed legislation, what the people's elected representatives actually enacted as a collective body. The Legislature's "broad definition, narrow exception" approach to "general contractor" and deletion of the upstream-contract language constitute dual reasons for not barring dual roles for those meeting the Act's liberal definitional criteria.

Second, we eschew guesswork, and a bill's failure to pass sheds no light because, as even casual Capitol observers know, bills fall short for countless reasons, many of them "wholly unrelated" to the bill's substantive merits or "to the Legislature's view of what the original statute does or does not mean."[46] Bills rise and fall for

---

**44.** Nothing in the amendment itself defined "owner," and despite what one amicus describes as "hundreds of hours of hearings that led to the 1989 overhaul," not a single word was devoted to this single word. The legislative record lacks any signal as to what even one lawmaker thought about expressly including owners, whether it was thought ill-advised or redundant or even thought about at all.

**45.** *See* 282 S.W.3d 433.

**46.** *Tex. Employment Comm'n v. Holberg*, 440 S.W.2d 38, 42 (Tex.1969) ("we attach no controlling significance to the Legislature's failure to enact the proposed amendment"); *see also El Chico Corp. v. Poole*, 732 S.W.2d 306, 314 (Tex.1987); *Dutcher v. Owens*, 647 S.W.2d 948, 950 (Tex.1983) (warning against gleaning legislative intent from failed bills: "Any such inference would involve little more than conjecture.").

Nor, as the Court stresses, 282 S.W.3d 433, can post-hoc statements by legislators shed light on what a statute means. *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117–18, 100 S.Ct. 2051, 64

L.Ed.2d 766 (1980) (disregarding such statements about an earlier-passed statute: "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one"). The Legislature is composed of 181 diverse members representing diverse areas with diverse priorities; one lawmaker's perspective may be radically different than that of his or her 180 colleagues. *See AIC Mgmt. v. Crews*, 246 S.W.3d 640, 650 (Tex. 2007) (Willett, J., concurring) ("The statute itself is what constitutes the law; it alone represents the Legislature's singular will, and it is perilous to equate an isolated remark or opinion with an authoritative, watertight index of the collective wishes of 181 individual legislators, who may have 181 different motives and reasons for voting the way they do."); *Gen. Chem. Corp. v. De La Lastra*, 852 S.W.2d 916, 923 (Tex.1993) ("[T]he intent of an individual legislator, even a statute's principal author, is not legislative history controlling the construction to be given a statute."). This explains our consistent view—reinforced by the U.S. Supreme Court, *see, e.g., Heller*, 128 S.Ct. at 2805—that post-passage actions and comments are immaterial:

reasons both incalculable and inscrutable, and courts' reluctance to draw inferences from subsequent legislative inaction is deeply rooted, as explained by the United States Supreme Court a half-century ago: "Such non-action by Congress affords the most dubious foundation for drawing positive inferences.... Whether Congress thought the proposal unwise ... or unnecessary, we cannot tell; accordingly, no inference can properly be drawn from the failure of the Congress to act."[47] We, too, reject searching for confirmation or contradiction in later sessions' unsuccessful bill drafts.[48] As non-adoption infers nothing authoritative about an earlier statute's meaning, we do not consult failed bills to divine what a previous Legislature intended.

Even if our precedent allowed us to conflate inaction with intention, the bills, as the Court notes, were not only unsuccessful but immaterial. The bill that comes closest, Senate Bill 1404 from the 76th Legislature in 1999, would have amended "general contractor" to include "an owner or lessor of real property."[49] Any relevance ends there. Senate Bill 1404 would have let general contractors (whether owners or not) invoke the exclusive-remedy defense either by providing coverage directly or "by entering into a written agreement with another person under which the other person provides the coverage."[50] Today's question differs significantly: whether a premises owner who meets every current statutory-employer criteria is nonetheless excluded. So while some bills over time would have extended comp-bar immunity to owners (1) who merely require coverage (Senate Bill 1404),[51] (2) who directly provide coverage but do not also act as their own general contractors (House Bills 2279 and 3024),[52]

[C]ourts construing statutory language should give little weight to post-enactment statements by legislators. Explanations produced, after the fact, by individual legislators are not statutory history, and can provide little guidance as to what the legislature collectively intended. *In re Doe*, 19 S.W.3d 346, 352 (Tex.2000) (quoting *C & H Nationwide, Inc. v. Thompson*, 903 S.W.2d 315, 328–29 (Tex.1994) (Hecht, J., concurring and dissenting) (citations omitted)). The very notion of "subsequent legislative history" is oxymoronic. After-the-fact comments may constitute history, and they may concern legislation, but they are not part of the legislative history of the original enactment. *See Rogers v. Frito–Lay, Inc.*, 611 F.2d 1074, 1082 (5th Cir.1980). Judge Posner offers a grave caution: Judges who credit "subsequent expressions of intent not embodied in any statute may break rather than enforce the legislative contract." RICHARD A. POSNER, THE FEDERAL COURTS 270 (1985). Judges also risk getting snookered. *See, e.g., Am. Hosp. Ass'n v. NLRB*, 899 F.2d 651, 657 (7th Cir.1990) ("Post-enactment legislative history ... is sometimes a sneaky device for trying to influence the interpretation of a statute, in derogation of the deal struck in the statute itself among the various interests represented in the legislature. Courts must be careful not to fall for such tricks and thereby upset a legislative compromise.") (citations omitted). Finally, even proponents of legislative history, even those proponents willing to consider legislators' post-enactment comments, disregard statements from legislators who did not hold office when the disputed statute was enacted.

47. *United States v. Price*, 361 U.S. 304, 310–11, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960). *See also Perez v. United States*, 167 F.3d 913, 917 (5th Cir.1999) ("deductions from congressional inaction are notoriously unreliable").

48. *Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527 (Tex.2000) ("If possible, we must ascertain the Legislature's intent from the language it used in the statute and not look to extraneous matters for an intent the statute does not state.").

49. *See* Tex. S.B. 1404, 76th Leg., R.S. (1999).

50. *Id.*

51. *Id.*

52. *See* Tex. H.B. 2279, 74th Leg., R.S. (1995); Tex. H.B. 3024, 75th Leg., R.S. (1997).

(3) who are a parent or subsidiary corporation of an entity that provides coverage (House Bill 3120, House Bill 3459, and Senate Bill 675),[53] or (4) who are engaged in construction or building with a general contractor and a subcontractor where one of them provides coverage (House Bills 2982 and 1626),[54] those expansions of immunity are committed to the Legislature's broad policymaking discretion. They are not today's case, which examines whether Entergy is disqualified under existing law despite meeting every applicable criteria.

As for Senate Bill 1404, the legislative record is completely bare as to the individual sponsor's (or anyone else's) objective. The bill was referred to committee and then left pending; no hearing, no testimony, no bill analysis, no action whatsoever. Even if the bill were on all fours, a single bill—filed the day before the filing deadline [55] and never heard from again—hardly constitutes the Legislature "repeatedly reject[ing]" the notion of a premises owner acting dually as a general contractor under the Workers' Compensation Act. In fact, even if there were a failed bill that added "owner" to the existing definition and nothing else, it would be immaterial. Lawmakers may have thought such a bill unwise, or maybe unnecessary. Who knows? Either way, it is imprudent for courts to draw forensic truths from legislative machinations, ascribing intent and motivations based on nothing more than a judge's hunch as to what 181 autonomous lawmakers collectively had in mind. As Judge Easterbrook observes, "Intent is elusive for a natural person, fictive for a collective body." [56]

## B. Neither purposive analysis nor off-the-mark representations regarding legislative history can trump the Legislature's enacted text

On a related front, amici supporting Summers exhort us to throw off our interpretive "shackles" and embrace a "thorough" and "expansive methodology" that relies on various interpretive tools that look beyond the Legislature's chosen language. Given the lack of textual ambiguity, I reject this eclectic approach.[57] The text that lawmakers passed is the truest index of legislative will, and the Legislature defines "general contractor" in terms of what a contractor *does*, not in terms of what a contractor *owns*. The definition uses the word "owner" exactly one time, to make clear that motor carriers that use owner operators to provide transportation services are excluded. There is indeed an owner-related exclusion in the Act, but it is specific, not general.

Notably, the dissent, while siding with Summers, also declines this nontextual approach. True, we periodically consult external materials when text is nebulous and susceptible to varying interpretations, but

---

53. *See* Tex. H.B. 3120, 77th Leg., R.S. (2001); Tex. H.B. 3459, 77th Leg., R.S. (2001); Tex. S.B. 675, 78th Leg., R.S. (2003).

54. *See* Tex. H.B. 2982, 78th Leg., R.S. (2003); Tex. H.B. 1626, 79th Leg., R.S. (2005).

55. *See* Tex. S. Rule 7.07(b), Tex. S. Res. 14, 81st Leg., R.S., 2009 S.J. of Tex. 21, 23.

56. Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 HARV. J.L. & PUB. POL'Y 61, 68 (1994).

57. As the Court reaffirms today, if the Legislature's words are not ambiguous, they are not only the best evidence of legislative intent but the exclusive evidence. 282 S.W.3d 433. Even if we accepted the invitation to utilize extratextual aids to divine a more embellished meaning, it would make little difference here. The record surrounding the Act's adoption and the nine failed post–1989 bills lacks any indication that lawmakers meant to disqualify owners from acting as their own general contractors under the Act.

even then, we proceed "cautiously,"[58] mindful that such materials conflict as often as they converge and that our goal is "to solve, but not to create, an ambiguity."[59] Even in rare cases where we mine secondary sources to help clarify ambiguity, judges, while not limited *to* the text, should always be limited *by* the text.[60]

Indeed, this case demonstrates vividly the perils of uncritical reliance on legislative history. It is distressing that those citing the legislative record in this case sometimes do so:

- *inaccurately:* misstating when key legislative changes to the draft Act occurred;[61]

- *selectively:* playing up friendly snippets that they believe reinforce a wished-for interpretation and ignoring snippets that subvert it;[62]

- *misleadingly:* mischaracterizing the import of legislative actions;[63]

**58.** *Alex Sheshunoff Mgmt. Servs. v. Johnson,* 209 S.W.3d 644, 652 n. 4 (Tex.2006).

**59.** *United States v. Shreveport Grain & Elevator Co.,* 287 U.S. 77, 83, 53 S.Ct. 42, 77 L.Ed. 175 (1932) (quoting *Hamilton v. Rathbone,* 175 U.S. 414, 421, 20 S.Ct. 155, 44 L.Ed. 219 (1899)).

**60.** Justice Frankfurter cautioned against what he called "loose judicial reading": "Loose judicial reading makes for loose legislative writing. It encourages the practice illustrated in a recent cartoon in which a senator tells his colleagues 'I admit this new bill is too complicated to understand. We'll just have to pass it to find out what it means.' " Felix Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Colum. L.Rev. 527, 545 (1947).

**61.** For example, one amicus curiae mistakenly asserts the Legislature deleted the upstream-contract language during the 1993 nonsubstantive codification. This misstep matters, as the amicus argues from this false premise that since "contracted with another party"—a phrase the amicus bolds and labels "enlightening"—was omitted in 1993, its absence cannot aid Entergy since "the Legislature intended *no substantive change* to the law by its 1993 codification." Thus, since lawmakers wanted to maintain the status quo, we must read back into the Act a critical phrase the Legislature deleted. One problem: the upstream-contract provision, which is indeed "enlightening," was deleted not during the 1993 nonsubstantive codification but during the 1989 substantive overhaul, when lawmakers enacted a raft of major changes. *See* Act of May 28, 1983, 68th Leg., R.S., ch. 950, § 1, sec. 6(b), 1983 Tex. Gen. Laws 5210, 5210 (amended 1989). Interestingly, this amicus apparently realized its error because its sup-

plemental brief acknowledges that "contracted with another party" was deleted during the 1989 reform when "subcontractor" was rewritten, "though not extensively," the amicus now insists.

Another amicus brief contains at least two factual missteps in recounting the Legislature's 1989 deliberations. First, the brief inaccurately states, "In the draft bill considered during the regular session, immunity was extended to owners, as well as general contractors." The word "owner" never appeared during the regular session; it appeared in a House revision during the first-called special session. Tex. S.B. 1, 71st Leg., 1st C.S. (1989); *see also* H.J. of Tex., 71st Leg., 1st C.S. 76 (1989). The brief then errs again, stating "in the subsequent special session [the Legislature] removed premises owners from the list of actors granted immunity." Nobody in either chamber removed "owner" in the first-called special session; just the opposite, "owner" was momentarily *added* during this special session (and was absent from the bill adopted during the next session several months later). *Id.* Unless challenged by opposing counsel, such inaccuracies, however inadvertent, carry real potential to mislead judges and skew judicial decisionmaking.

**62.** *See infra* note 64. It is unsurprising that advocates accentuate the positive and eliminate the negative. Such cherry-picking, as Judge Harold Leventhal famously observed, is "the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends." *Conroy v. Aniskoff,* 507 U.S. 511, 519, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993) (Scalia, J., concurring).

**63.** As noted above, *supra* note 61, one brief states the Legislature "removed premises

And then, when confronted with a tidbit from the record that can be spun Enter-

gy's way, Summers dismisses it as something uttered mistakenly.[64]

owners from the list of actors granted immunity." This suggests the Legislature took targeted action to eliminate "owner" from a pending draft. The legislative record belies this suggestion. Nobody "removed" the word "owner" during the second special session, because no bill that session ever *included* the word "owner." You cannot remove what does not exist, subtracting what is not there. The locution implies that lawmakers in 1989 took proactive steps to strip "owner" from a pending bill, but "removed" is not the same as "not included." Nothing in the record shows specific action to remove "owner" from any bill during that final special session. The word was absent altogether, though the record contains nothing to suggest why.

Another brief follows suit, stating that during the first special session, after the House passed a bill that contained "owner," the Senate "refused to concur in the House amendments." While literally true—the Senate did in fact reject House changes—it suggests senators balked specifically at "owner." Not exactly. After the Senate passed Senate Bill 1, the House struck everything below the enacting clause, substituted an earlier House-passed version (which differed markedly from the Senate version) and sent it back across the rotunda. *See* H.J. of Tex., 71st Leg., 1st C.S. 76 (1989). Nothing suggests the Senate refused to concur because of "owner." In fact, a treatise (co-authored by the lead Senate sponsor) states the Senate's refusal rested on entirely separate issues. *See* MONTFORD, *supra* note 42, at 3 (noting consensus stalled due to "colossal differences in the dispute resolution and benefits proposals"). Still another brief asserts that "efforts in prior drafts to include the term 'owner' were rejected." This wording suggests multiple targeted efforts to erase "owner" from pending drafts, but the lone mention of "owner" came in the first special session, in a bill that died over unrelated issues. The brief states a House amendment "specifically included the word 'owner' " and the Senate "refused to concur in the House amendment, and the bill failed." The inference is misleading: the House amendment was not a rifle-shot inclusion of "owner" but a wholesale substitution of its earlier bill, with all the "colossal differences" noted by Senator Montford.

**64.** Just before final passage, Senator Dickson, who opposed tort immunity for general contractors, attached a floor amendment stating that a subcontractor's workers could bring a "third party action ... against said general contractor." Senator Dickson contended that, absent his amendment, a refinery owner would be immune if an accident killed a subcontractor's employees: "Yes sir it seems to me ... [that] no matter how negligent, no matter how much at fault that operator was, and no matter how many people he killed, he wouldn't be liable." Debate on Tex. S.B. 1 on the Floor of the Senate, 71st Leg., 2d C.S. 17 (Nov. 20, 1989) (transcript available from Senate Staff Services Office).

Senator Edwards: So in a case like the Phillips refinery explosion, if Phillips had been negligent and your amendment wasn't law, even though dozens of people were killed, Phillips wouldn't be liable in any way for their negligence?"

Senator Dickson: He would be immune. Would not be liable according to Senator Glasgow's construction and my reading of this new statute.

*Id.* Senator Dickson's pro-plaintiff amendment was later removed. This colloquy did not address whether "general contractor" included owners, but it is notable that Senator Edwards's hypothetical presumed the owner and the general contractor were one and the same. If that contradicted the Senate's collective intent, no senator rose to correct it. As Senator Dickson described his own amendment, it was to ensure that an owner's injured contract worker would not be limited to comp benefits. Summers says Senator Dickson was "simply confused" and later "got sort of educated" that the bill did not contemplate owners doubling as general contractors. The floor transcript reveals no such enlightenment.

While this discussion is not dispositive (or even relevant)—Senator Dickson's view is merely his alone, not fairly attributable to his 180 colleagues—it posed the issue presented here: a premises owner acting as a general contractor. If Senator Dickson was off-target because the Legislature never intended to let owners claim general-contractor status, no senator called it to the Senate's attention. The only reason I mention it is to stress how

Laws exist to guide behavior, and by resting on statutory language rather than embarking on a scavenger hunt for extra-textual clues prone to contrivance,[65] we ensure that everyday Texans struggling to decode the law and manage their affairs consistent with it can rely on a statute "to mean what it says,"[66] without having to hire lawyers to scour the legislative record for unexpressed (and often contradictory) indicia of intent. As we recently held, if text is not hazy, we must resist morphing statutory construction into statutory excavation and instead "take the Legislature at its word and not rummage around in legislative minutiae."[67]

## C. The Act is not "absurd" if injured *deemed* employees receive the same relief as injured *direct* employees

Summers insists we must adopt a relaxed interpretation more consonant with fairness because reading "general contractor" to limit contract workers to the same recovery that direct workers receive would render the term "meaningless and ab-

surd."[68] While a looser reading is warranted when a straight-up reading produces a patently nonsensical result (not merely an unpleasant one), this is not such a case.

Under Summers' reading, a separate contractor would escape tort liability, but a premises owner who performs every contracting-related chore the separate contractor would perform would not. More to the point, a general contractor that oversees work on its *own* property could not qualify as a general contractor under the Act. That was perhaps true in the 1983–1989 Act, as *Wilkerson* held, but the Legislature's top-to-bottom rewrite amended the law.

One can complain that current comp benefits are inadequate, but it is unpersuasive to equate equality—direct and contract employees receiving the same benefits when the employer owns the jobsite—with absurdity.[69] There is nothing nonsensical (or even uncommon[70]) about a premises owner serving as its own general contractor or a reading of the Act that results

---

manipulable legislative history can be (by lawyers and judges alike), and that its indeterminacy is only made worse by the selectivity with which it is utilized.

**65.** It is not hard to imagine a legislator voting for a bill she actually opposes and then reading into the record a restrictive interpretation that aims to blunt the bill's real-world impact. Looking at today's case specifically, a crafty lawmaker who wanted "general contractor" construed narrowly could file a bill that explicitly *added* the word "owner" to the definition, then quietly urge that the bill stay buried in committee so a future litigant can cajole a judge into believing that the Legislature's failure to pass the bill evinces legislative rejection of an owner-included definition.

**66.** *Fitzgerald v. Advanced Spine Fixation Sys.,* 996 S.W.2d 864, 866 (Tex.1999).

**67.** *Alex Sheshunoff Mgmt. Servs. v. Johnson,* 209 S.W.3d 644, 652 n. 4 (Tex.2006).

**68.** We enforce the Legislature's words as written unless such a reading would produce absurd results. *Fleming Foods of Tex., Inc. v. Rylander,* 6 S.W.3d 278, 284 (Tex.1999).

**69.** Summers argues the Court's ruling would work an absurdity by opening up workers' compensation benefits to a neighborhood child who rakes your leaves. The Act expressly contradicts that argument, speaking directly to "a person employed as a domestic worker or a casual worker engaged in employment incidental to a personal residence." TEX. LAB.CODE § 406.091(a)(1). The Act exempts such employees from coverage, though it allows employer-homeowners to voluntarily accept the rights and responsibilities of providing such coverage. *Id.* § 406.091(b). It would be curious to brand legally "absurd" something the statute itself permits. Comp-covered lawnboys are possible under the Act because the Legislature, not this Court, explicitly says so.

**70.** 282 S.W.3d 433.

in expanded jobsite coverage by urging premises owners to secure coverage for their subcontractors' workers.[71] The comp system quid pro quo—exchanging uncertain tort recovery for no-fault medical and income benefits—has been the embedded public policy of Texas since Woodrow Wilson became President, and wider coverage—that is, *more* injured workers receiving such compensation—only advances that policy.

## D. Judges have no authority to second-guess the myriad policy judgments codified in the Workers' Compensation Act

The 1989 restructuring of the Texas workers' compensation scheme—labeled "the most divisive legislative endeavor in contemporary Texas politics"[72]—consumed the 71st Legislature for one regular and "two special sessions fraught with obstinacy and emotion."[73] What emerged embodied innumerable and quintessential legislative judgments. The recovery of workers' comp benefits is dictated by the Legislature's definitions, not by this Court's declarations. We must refrain from rewriting the text lawmakers chose,

here by reinserting third-party language the Legislature deleted.[74]

Laid bare, Summers' core complaint is that benefits under the Act are too stingy. We are ill-equipped to assess this charge. The Act, whatever its alleged shortcomings, embodies century-old public policy, and courts must read the Legislature's words as enacted, not revise them as desired. "The wisdom or expediency of the law is the Legislature's prerogative, not ours"[75]—a fundamental point we recently reaffirmed: "arguments that the statute is unwise or unfair must be addressed to the Texas Legislature."[76]

It may be correct that lawmakers in 1989 did not intend to permit a dual-hat role for premises owners. Workers' comp reform was a Herculean, multiple-session undertaking, one made tougher with short deadlines for drafting and short fuses for drafters. Heaven knows laws sometimes pass quickly amid urgent circumstances with scant discussion, yielding untoward ramifications over time. Recent examples of voting-without-reading abound, including the newly passed $789,000,000,000 (and 1,073–page) American Recovery and Reinvestment Act of 2009, which provided "a

---

71. One side point: While recovery of workers' compensation benefits is a covered worker's (or his legal beneficiary's) exclusive remedy in the event of a work-related injury or death, Tex Lab.Code § 408.001(a), the very next subsection makes clear that a worker's surviving spouse or heirs may sue for exemplary damages if the death "was caused by an intentional act or omission of the employer or by the employer's gross negligence," *id.* § 408.001(b).

72. Montford, *supra* note 42, at 1.

73. Williford, *supra* note 41, at 11–12.

74. Our precedent reaching back a century demands judicial modesty, and for such modesty to take root, "[c]ourts must take statutes as they find them. More than that, they

should be willing to take them as they find them." *Simmons v. Arnim*, 110 Tex. 309, 220 S.W. 66, 70 (1920).

75. *Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 520 (Tex.1995) (quoting *Smith v. Davis*, 426 S.W.2d 827, 831 (Tex. 1968)).

76. *In re Jorden*, 249 S.W.3d 416, 424 (Tex. 2008). We sometimes weigh the Legislature's *power* to enact a statute, but, heeding Justice Holmes's admonition, we never weigh its *prudence:* "We fully understand ... the very powerful argument that can be made against the wisdom of the legislation, but on that point we have nothing to say, as it is not our concern." *Noble State Bank v. Haskell*, 219 U.S. 575, 580, 31 S.Ct. 299, 55 L.Ed. 341 (1911).

rare window into the mad cookery of complex legislation"—the final draft "filled with hand-written copy-editing marks, insertions scrawled in the margins, deletions of whole paragraphs boxed with X's slashing through them, and a variety of curious hash marks and other annotations."[77] Even Evelyn Wood would struggle mightily to read the bill, much less cast an informed vote.

Even when laws *are* meticulously drafted and thoughtfully debated, legislative handiwork must often bend to a still more powerful force: the law of unintended consequences.[78] To be sure, people are inventive at finding ways to confound lawmakers' wishes rather than conform to them. But even if we suspected lawmakers intended to retain a third-party requirement despite deleting third-party language, we could not judicially reinsert the requirement, however desirable as a policy matter.

Legislative text is often elastic, like the "general contractor" definition in this case, but the judicial role is not. When divining what lawmakers intended to do, we must focus on what they in fact did do and presume they meant what their words mean. Where language is not unclear, a judge's doctrinal toolbox is limited. I do not share the view that reliance on text is pretext, that reading laws as written is mere figleafing to disguise judicial willfulness aimed at imposing ideologically congenial results. Purposive decisionmaking is achieved more readily (and easily) by straying from text than by sticking to it, and hewing to the Legislature's as-written language has repeatedly led me to results I strongly dislike.

Obviously, if lawmakers in 2009 (or later) dislike the Court's interpretation of the words their 1989 predecessors chose— or believe their predecessors drafted with imprecision—the remedy, and it is a simple one, rests wholly with them. This is precisely how the separation of powers works among co-equal branches of government. The presumption that lawmakers intended what they enacted is not just required and well-settled but desired and well-founded. It is an accommodation rooted in carefulness, not certitude. The Legislature can easily reinsert an up-

**77.** Posting of David M. Herszenhorn to the Caucus: The Politics and Government Blog of the Times, http://thecaucus.blogs.nytimes.com/2009/02/13/ final-draft-on-stimulus-bill-complete-with-last-minute-edits/ (Feb. 13, 2009, 9:52 EST). *See also* Mark Lander, *New Terrain For Arbiters Of a Bailout*, N.Y. Times, Nov. 4, 2008, at B1 (describing the no-time-for-reading dynamic surrounding passage of the October 2008 federal financial rescue package). Another classic federal example is the 1989 Budget Reconciliation Act, which consisted of a thousand-plus, unnumbered, and unindexed pages bound together with rope. *See* Rep. Christopher Cox, *Why Congress Doesn't Work, Part I*, Lecture # 406 (Sept. 11, 1992) (reprinted at http://www.heritage.org/research/governmentreform/HL406.cfm):

There was no other copy for any member to look at or read, other than what was in this box. Now I will allow, while I was not able to read it, I was permitted to walk down into the well and gaze upon it from several angles, and even to touch it. When we voted on that bill, at about four o'clock in the morning, not a single member of the House had read it; not a single member of the Senate had read it.

**78.** One example is the federal luxury tax, imposed in 1990 on everything from furs to yachts. Proponents saw it as a pain-free, palatable and progressive way to raise tax revenue, but the impact was staggering. The boat-building industry was capsized, throwing thousands of blue-collar workers out of work, in turn straining public welfare and unemployment budgets as dislocated workers sought relief. Congress swiftly repealed the tax. Phil Hampton, *Boating Casts Off Bad Times, Sales Swell After Luxury Tax Drowns*, USA Today, Aug. 19, 1994, at 01B.

stream-contract provision if it believes our interpretation is wooden legalism that honors the letter of the law but not its spirit, thus letting premises owners slip through an unintended loophole.

## IV. A Brief Take on the Dissent

The Court briefly addresses the dissent's arguments, but more can be said. The dissent's chief contention is that lawmakers "expressly tethered" general contractor to other terms that are "commonly understood to mean a person who has contracted with an owner" [79]—like " 'principal contractor,' 'original contractor,' and 'prime contractor' ... all terms that envision a tripartite relationship" among an owner, a general contractor, and subcontractors.[80] The dissent acknowledges the listed terms "are not exhaustive" but concludes, rather conclusorily, that the notion of an owner-contractor "is simply not analogous." [81]

Like the Court, I find the dissent's argument unpersuasive, for several reasons. First, the dissent cites the "common usage" provision of the Code Construction Act [82] in urging a "commonly understood" reading of general contractor. However, the Act's very next provision stresses that "common usage" must yield to specific legislative definitions.[83] Thus, "ordinary meanings should be applied only to unde-

fined terms." [84] The Legislature enacted a specialized definition of general contractor, and in 1989 deleted not only the upstream-contract condition, but also the injunction to interpret the synonyms for general contractor "as those terms are commonly used." [85] If a statute defines a term, "a court is bound to construe that term by its statutory definition only," [86] deference that seems especially warranted where, as here, the statute omits an earlier directive to apply common usage. In any case, given the ordinariness of premises owners acting as their own general contractors,[87] I fail to understand the dissent's outright rejection of "owner contractor" as dissimilar.

Second, the dissent looks for support in statutory definitions of "contractor" outside the Workers' Compensation Act that explicitly mention a third-party requirement.[88] However, none of these cited provisions define *general* contractor. There exists in Texas statutory law only one definition of this term, Labor Code section 406.121, the provision at issue today. The Act nowhere defines "contractor," though "independent contractor," the term most analogous to the non-Act "contractor" provisions cited by the dissent, *is* defined (immediately below the definition of "general contractor") as someone "who contracts to perform work or provide a ser-

---

**79.** 282 S.W.3d 433 (O'Neill, J., dissenting).

**80.** *Id.* at 484.

**81.** *Id.* at 485.

**82.** *Id.* at 485 (citing TEX. GOV'T CODE § 311.011(a)).

**83.** TEX. GOV'T CODE § 311.011(b) ("Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly.").

**84.** *Tijerina v. City of Tyler,* 846 S.W.2d 825, 827 (Tex.1992).

**85.** *See supra* note 20.

**86.** *Tex. Dep't of Transp. v. Needham,* 82 S.W.3d 314, 318 (Tex.2002); *see also Transp. Ins. Co. v. Faircloth,* 898 S.W.2d 269, 274 (Tex.1995) ("[w]e are bound to construe these terms in accordance with their statutory definitions").

**87.** *See* 282 S.W.3d 433.

**88.** 282 S.W.3d 433 (O'Neill, J., dissenting).

vice *for the benefit of another.*[89] The definition by its terms requires an upstream relationship, something the "general contractor" definition does not. If anything, the provisions cited by the dissent, and the "independent contractor" definition in the Act itself, only strengthen the Court's position, showing that the Legislature is adept at including explicit third-party language when it chooses. The fact that the Legislature did not add third-party language here—even more, it *subtracted* such language—only fortifies the Court's interpretation.

Third, the dissent relies on two of our prior cases to assert we have "recognized for almost a century that a contractor" has a third-party requirement.[90] A careful examination of these cases, however, shows that both cases concern whether an injured worker is an employee or an independent contractor and not whether a premises owner can qualify as a general contractor.[91] Together, the two cases use the phrase "independent contractor" nineteen times and the phrase "general contractor" none at all. The cases are simply inapposite, though again, by focusing on "independent contractor," they draw attention to the Act's current definition of that term, one that on its face requires a third-party relationship, unlike the "general contractor" definition that immediately precedes it.

Finally, the absence of "owner contractor" from a list the dissent concedes is nonexhaustive [92] (something we must construe liberally) is less notable than the absence of "premises owner" from the Act's exclusion (something we must construe strictly). The analogous terms seem of a kind and interchangeable, which makes the motor-carriers exclusion seem markedly out of place, suggesting that the definition was otherwise broad enough to capture them. Stated differently, there seemed an awareness that entities beyond the listed terms could fall within the broad definition, but only this narrow class was carved out.

## V. A Brief Take on JUSTICE HECHT's Concurrence

If my understanding is correct, the dissenters reject their original view of the case and now insist a premises owner has never been entitled to statutory-employer status by providing comp coverage to subcontractors and their employees. Conversely, the Court and JUSTICE HECHT apparently believe that access to the exclusive-remedy defense by providing such coverage has been available perhaps since 1917, when a provision was added that is now section 406.124 of the Labor Code, and is certainly available today. My position, detailed above, is that the defense was made available in 1989, when lawmakers removed third-party language from the Act.

The Court's and JUSTICE HECHT's attention to section 406.124 and its earlier enacted versions is unhelpful (and unnecessary in my view given the deletion in 1989 of the upstream-contract language). Sec-

---

89. TEX. LAB.CODE § 406.121(2) (emphasis added).

90. 282 S.W.3d 433 (O'Neill, J., dissenting) (citing *Indus. Indem. Exch. v. Southard*, 138 Tex. 531, 160 S.W.2d 905, 907 (1942); *Shannon v. W. Indem. Co.*, 257 S.W. 522, 524 (Tex. Comm'n App.1924, judgm't adopted)).

91. *Southard*, 160 S.W.2d at 906; *Shannon*, 257 S.W. at 522–23.

92. TEX. GOV'T CODE § 311.005(13) (" 'Includes' and 'including' are terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded.").

tion 406.124 currently provides that if a "person" hires a "subcontractor," not for any legitimate reason but instead "with the intent to avoid liability" under the workers' compensation laws, the scheme will fail because the worker will be deemed the person's employee. This provision earlier applied to "subscribers" rather than "persons," but in any case it has always applied to all statutory employers subject to the workers' compensation laws.

Section 406.124 is a rarely employed subterfuge provision intended to thwart sham attempts by an employer to mischaracterize an employee as a subcontractor and thereby avoid comp liability. It says as much—applying to all statutory employers and targeting efforts to evade liability. The general-contractor provision at issue in today's case, currently section 406.123, addresses the separate matter of extending statutory-employer status to a general contractor who retains a legitimate, independent subcontractor and wishes to cover the subcontractor's employees. The general-contractor provision was added in 1983, and substantively rewritten in 1989, as I discuss above.

I essentially agree with Justice O'Neill on this point. None of the parties rely on section 406.124, and it is irrelevant to the key inquiry: whether a premises owner can be a general contractor under section 406.123. The latter provision has never applied to all subscribers, but is limited to general contractors. Today's issue is whether a premises owner can fall within

the definition of "general contractor," a subset of all subscribers.

So while I agree with the Court's result and most of its reasoning, I part company with the Court and Justice Hecht on the relevance of the subterfuge provision and its history, even though the changes to this provision and the eventual enactment of the general-contractor provision share a common legislative ancestry to some extent. In short, I see less ambiguity than Justice Hecht does in the general-contractor and subcontractor definitions. (Interestingly, he attaches no significance to the Legislature's 1989 deletion of "contracted with another party.") If anything, his meticulous effort to lay out the history of sections 406.123 and 406.124 and their interplay convinces me, more than ever, that we should focus on the text as enacted (and amended) and resist entreaties to meditate on the varying motives and atmospherics that may have spurred the thousand-plus Texas legislators who have dealt with workers' compensation over the past ninety-six years. I simply do not share Justice Hecht's "ambiguity" diagnosis,[93] though I certainly share his aversion to divorcing text, plain or not, from context.[94]

For the reasons discussed in Parts I–IV above, I disagree that the Act can be read either way and thus requires a gestalt examination of a near-century of legislative machinations for whatever authoritative lessons can be gleaned from that odyssey, interesting though it may be.[95] Again, I

---

**93.** 282 S.W.3d 433 (Hecht, J., concurring).

**94.** *City of Rockwall v. Hughes,* 246 S.W.3d 621, 632 (Tex.2008) (Willett, J., dissenting) ("The import of language, plain or not, must be drawn from the surrounding context, particularly when construing everyday words and phrases that are inordinately context-sensitive.").

**95.** Besides finding little useful in the history of section 406.124, I also disagree with the

notion that our decision should turn on a rule that construes statutory ambiguities in favor of workers' comp coverage and against common-law tort liability. I do not believe we can say the Legislature, actually many different Legislatures, urges a comp-over-tort rule whenever uncertainly arises. The Legislature of course could expressly incorporate such a preference into the Act, but it has not done so. The Workers' Compensation Act and the common law of negligence are both comprehen-

would hold that the general-contractor provision, unlike its pre–1989 version, does not forbid a premises owner from acting as its own general contractor.

## VI. Conclusion

Courts are charged with exercising judgment, not will,[96] and judicial judgment—awareness of the line between adjudication and legislation and refusing to cross it—means giving wide berth to legislative judgment. On policy matters, we must aim for utter disinterestedness, meaning we must interpret the Act as it is written, not as we might have written it. The Texas Workers' Compensation Act is replete with countless policy trade-offs, and our confined role, one defined chiefly by limits and duties, not by powers, is to construe statutes as we find them, not to second-guess or refine them.

The Court has reached the correct result, and for the reasons discussed above, I join all but Parts IV, V, and VIII of its decision.

Justice O'NEILL filed a dissenting opinion in which Chief Justice JEFFERSON and Justice MEDINA joined.

Justice O'NEILL, dissenting, joined by Chief Justice JEFFERSON and Justice MEDINA.

The Court today concludes that premises owners who pay (and recoup) their subcontractors' workers' compensation premiums are, *and have always been,* entitled to the Workers' Compensation Act's exclusive-remedy defense against their subcon-

tractors' injured employees. The Court pins its analysis on a 1917 provision that was designed to prevent "subscribers" from creating sham subcontractor relationships in order to avoid covering their own injured employees. Remarkably, neither the parties nor the dozens of amici curiae in this case have proffered such an interpretation. Although the Court concludes that the law in this regard has remained essentially the same since 1917, the Legislature first afforded a general contractor that "ha[d] contracted with another party to perform" work the right to voluntarily assume statutory employer status in 1983. Had all "subscribers" always been statutory employers of subcontractors' employees, this statutory revision and its 1989 iteration would make no sense.

The parties and amici appear to agree, as do I and Justice Willett, that before 1989 premises owners were not "general contractors" under the Act. The appropriate inquiry, then, is not whether the 1989 "general contractor" definition *excludes* premises owners, as the Court posits, but whether the Legislature intended to change prior law by expanding the definition to *include* premises owners when it rewrote the Act in 1989 and expressly tethered the term to others commonly understood to mean a person who has contracted with an owner. Had the Legislature intended to change the law in 1989 and for the first time afford premises owners the exclusive-remedy defense against subcontractors and their employees, it would surely have been simpler to say so by using the broader term "subscriber," or by including the term "owner contractor"

sive, time-honored systems of compensating injured individuals. While I would reject any suggestion from Summers and his aligned amici that workers' compensation is a disfavored remedy, likewise I cannot agree that in all cases of doubt the Legislature would have

us elevate the statutory system over the common-law system and apply the statutory remedy whenever statutory coverage is unclear.

**96.** *See* THE FEDERALIST No. 78 (Alexander Hamilton).

**482**

in the description of analogous terms that define a general contractor.

A few points bear noting at the outset. First, whether workers' potential recovery is greater under the common law or the Workers' Compensation Act, and whether one scheme promotes workplace safety over the other, is a legislative call, not ours. Second, one cannot contract into the Act's protections if the Legislature did not intend to allow it; accordingly, that Entergy reserved any right it might have to assert a statutory-employer defense against IMC's employees, or that Summers accepted workers' compensation benefits paid for by Entergy (and deducted from the contract price), does not inform the statutory analysis. And finally, whether premises owners *should* be afforded the Act's protections by paying their general contractor's workers' compensation premiums, as general contractors are by paying the premiums of their subcontractors, is a policy choice we are not at liberty to make.

As the Court notes, this case has drawn much attention since our initial opinion, and numerous amici have weighed in. When this case was first presented, Summers' emphasis was on Entergy's proof regarding the existence of a written agreement and mistaken reliance on the Legislature's 1993 nonsubstantive recodification of the Labor Code. On rehearing, a more focused analysis of the applicable statutory text convinces me that the Legislature, in rewriting the Act in 1989, did not intend to change the general-contractor definition to include premises owners; to the contrary, it tied the definition to terms commonly understood to mean a person who has contracted with an owner. It might well

represent sound policy to allow premises owners to become statutory employers of their contractors' employees by providing workers' compensation coverage, potentially expanding the number of employees eligible to receive benefits under the Act.[1] Whether such an expansion would require an adjustment to premiums, benefits, or other provisions of the Act is something only policymakers can decide. Our job is to discern what the Legislature intended. And that body has restricted the option to parties analogous to "principal contractor[s]," "original contractor[s]," and "prime contractor[s]," entities that contract to perform work for third parties and who face no premises liability in the absence of control of the premises. Based on the statute's language and appropriate statutory construction principles, I do not agree that the Legislature intended the term "general contractor" to encompass premises owners within the Act's protections. Accordingly, I respectfully dissent.

## I.

### A. The Statutory Text

Under section 406.123 of the Act, "a general contractor and a subcontractor may enter into a written agreement under which the general contractor provides workers' compensation insurance coverage to the subcontractor and the employees of the subcontractor." TEX. LAB.CODE § 406.123(a). If such an agreement is reached and properly filed, the general contractor may deduct premiums from the amount owed the subcontractor without incurring penalties under section 415.006

1. Interestingly, Entergy's agreement to provide coverage for IMC's employees swept no additional employees into the workers' compensation system in this case. Before it was amended, the contract between Entergy and IMC required IMC to provide workers' com-

pensation coverage for IMC employees. The availability of this type of contractual arrangement, coupled with contractual indemnity provisions, may explain the dearth of case law arising under section 406.123(a).

of the Act, which prohibits employers from collecting premiums or benefits from their employees.[2] *Id.* § 406.123(d), (f). More importantly, the agreement makes the general contractor the statutory employer[3] of the subcontractor and the subcontractor's employees, shielded from tort liability by the Act's exclusive-remedy provision. *Id.* §§ 406.123(e), 408.001(a). The Act defines a general contractor as

> a person who undertakes to procure the performance of work or a service, either separately or through the use of subcontractors. The term includes a "principal contractor," "original contractor," "prime contractor," or other analogous term. The term does not include a motor carrier that provides a transportation service through the use of an owner operator.

*Id.* § 406.121(1). A subcontractor, in turn, is "a person who contracts with a general contractor to perform all or part of the work or services that the general contractor has undertaken to perform." *Id.* § 406.121(5). A close analysis of these definitions, particularly viewed in light of controlling statutory construction principles, compels the conclusion that the Legislature did not intend to allow a premises owner to assume general-contractor status and assert the Act's exclusive-remedy de-

fense against subcontractors and their employees at no additional cost to itself.

In construing a statute, our overarching purpose is to determine and effectuate the Legislature's intent. *State v. Shumake,* 199 S.W.3d 279, 284 (Tex.2006) (citing *City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 25 (Tex.2003)). The surest guide to that intent is, of course, the plain and common meaning of the language the Legislature has employed. *City of Houston v. Clark,* 197 S.W.3d 314, 318 (Tex. 2006) (citing *McIntyre v. Ramirez,* 109 S.W.3d 741, 745 (Tex.2003)). Treating premises owners who provide workers' compensation coverage to subcontractors and their employees as "general contractors" is inconsistent with the common meaning associated with the terms to which the definition is tied.

Throughout Texas statutory and common law, a contractor is generally understood to be a person or entity that enters into a contract with another for compensation. In interpreting the Act and its predecessors, we have for decades defined a contractor as " 'any person who, in the pursuit of an independent business, undertakes to do a specific piece of work *for other persons . . . .*' " *Indus. Indem. Exch. v. Southard,* 138 Tex. 531, 160 S.W.2d 905, 907 (1942) (quoting *Shannon v. W. Indem. Co.,* 257 S.W. 522, 524 (Tex. Comm'n App. 1924, judgm't adopted)) (emphasis added).[4]

---

**2.** The Court insists that Entergy "paid for" workers' compensation insurance covering IMC's employees. 282 S.W.3d at 482. It may be technically true that Entergy directly paid the insurance premiums, but it is undisputed that Entergy procured the insurance in exchange for a reduction in the cost of its contract. Thus, under the Court's construct, Entergy bought immunity from suit at no additional cost to itself.

**3.** The Act does not use that term, but I use it for ease of reference. Under the Act, "[a]n agreement under [section 406.123] makes the general contractor the employer of the subcontractor and the subcontractor's employees

only for purposes of the workers' compensation laws of this state." Tex. Lab.Code § 406.123(e).

**4.** Both the Court and Justice Willett recite the principle that we do not apply the ordinary meaning of a term if the Legislature has adopted a specialized definition, then promptly cast it aside by looking to the ordinary meaning of the words the Legislature used within the "general contractor" definition. This is necessary, of course, because we cannot determine whether a premises owner is "analogous" to the types of contractors listed in section 406.121(1) or what "undertakes to

While the precise issue before us in *Shannon* was whether a party seeking workers' compensation benefits was an *independent* contractor as opposed to an employee, we articulated a broader principle, *i.e.*, that a contractor is someone who performs work for someone else. Our Legislature has repeatedly echoed that understanding. *See, e.g.*, TEX. PROP.CODE § 28.001(1) (" 'Contractor' means a person who contracts with an owner...."); TEX. PROP. CODE § 53.001(7) (" 'Original contractor' means a person contracting with an owner...."); TEX. ELEC.CODE § 274.022(d) (" '[C]ontractor' means a newspaper or statewide association with which the secretary of state contracts under this section."); TEX. EDUC.CODE § 51.776(3) (" '[C]ontractor' in the context of a contract for the construction, rehabilitation, alteration, or repair of a facility means ... [a] legal entity that assumes the risk for constructing, rehabilitating, altering, or repairing all or part of the facility at the contracted price."); TEX. GOV'T CODE § 2166.2511(2) (" 'Contractor' in the context of a contract for a project means a ... legal entity that assumes the risk for constructing, rehabilitating, altering, or repairing all or part of the project at the contracted price.").

The illustrative language the Legislature included in the Workers' Compensation Act's "general contractor" definition is consistent with that general understanding: "principal contractor," "original contractor," and "prime contractor" are all terms that envision a tripartite relationship in which one entity enters into a contract to perform work for another and then retains subcontractors or independent contractors to do all or part of the work. *See, e.g.*, TEX. PROP.CODE § 53.001(7), (13) (" 'Original contractor' means a person contracting with an owner either directly or through the owner's agent," and " '[s]ubcontractor' means a person who has furnished labor or materials to fulfill an obligation to an original contractor or to a subcontractor to perform all or part of the work required by an original contract."); *Interstate Contracting Corp. v. City of Dallas*, 135 S.W.3d 605, 611–12 (Tex.2004) (using the term "prime contractor" interchangeably with "general contractor" in discussing pass-through claims); *Page v. Structural Wood Components, Inc.*, 102 S.W.3d 720, 721–22 (Tex.2003) (using the term "general contractor" interchangeably with "original contractor" in interpreting chapter 53 of the Property Code);[5] *see also* Op. Tex. Att'y Gen. No. DM–300 (1994) (ruling that university that hired independent contractors to provide work such as carpet installation and window repair did not act as a "hiring contractor" under section 406.141 of the Act because it did "not act even as a 'contractor' as that term is commonly understood," relying in part on section 406.121(1)'s general-contractor definition). While I acknowledge that the categories listed in the second sentence of section 406.121(1)'s "general contractor" definition are not exhaustive, the Legislature did make clear that *only* analogous entities are to be treated as general contractors. *See*

procure" means without examining how those terms are commonly understood.

5. While attaching some significance to a string of inapposite out-of-state cases, Justice Willett gives these examples no weight because some of them discuss a party's status as a "contractor" or an "independent contractor," rather than a "general contractor." But the person or entity at issue must first be a contractor before being further classified as an independent contractor, a subcontractor, or a general contractor. Moreover, several of these examples define terms that the Legislature has expressly deemed analogous to "general contractor" in section 406.121(1), including "original contractor" and "prime contractor."

TEX. LAB.CODE § 406.121(1). A premises owner is simply not analogous.[6]

The Court insists that the statutory definition controls over what it tacitly acknowledges is the commonly understood meaning of the term "general contractor." But the Legislature itself has mandated that "[w]ords and phrases shall be ... construed according to ... common usage," and that "[w]ords and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." TEX. GOV'T CODE § 311.011(a), (b). In this instance, common usage, the common law, and a host of legislative pronouncements are contrary to the meaning the Court attaches to the term. More importantly, the statutory language itself comports with, and is tied to, the general understanding of the term's meaning. When the Legislature enacted section 406.121, we had long defined a contractor as one who " 'undertakes to do a specific piece of work *for other persons ....* ' " *Southard,* 160 S.W.2d at 907 (quoting Shannon, 257 S.W. at 524 (emphasis added)). And Black's Law Dictionary, at the time the Legislature adopted the general-contractor definition, similarly defined a contractor as "a person who, in the pursuit of any independent business, undertakes to do a specific piece of work *for other persons ....*" BLACK'S LAW DICTIONARY 295 (5th ed.1979). It also stated that "[t]his term is strictly applicable to any person who enters into a contract, but is commonly reserved to designate *one who, for a fixed price ... undertakes to procure the performance of works or services ...* for the public or a company or individual."

*Id.* (emphasis added). In other words, a contractor is someone who receives payment for performing work for another. Section 406.121(1) precisely tracks these definitions by describing a general contractor as one who "undertakes to procure the performance of work or a service, either separately or through the use of subcontractors." TEX. LAB.CODE § 406.121(1). In light of this longstanding commonly understood usage, the Legislature could easily have defined "general contractor" to include premises owners if that was its intent, but it did not. Had the Legislature intended the term to be as conceptually broad as the Court and Justice Hecht today say it is, it could simply have written that "a subscriber and a subcontractor may enter into an agreement," but again, it did not.

The Court attaches a similarly strained meaning to the term "separately" within the general-contractor definition. (" 'General contractor' means a person who undertakes to procure the performance of work or a service, either separately or through the use of subcontractors.") *Id.* That is, the Court says that a premises owner acts "separately" when it engages subcontractors directly rather than through a general contractor. 282 S.W.3d at 441. But "separately" far likelier alludes to independent contractors, as opposed to subcontractors, terms which the Legislature defined differently in the same bill that introduced the "separately" language. *See* Act of Dec. 12, 1989, 71st Leg., 2d C. S., ch. 1, § 3.05, 1989 Tex. Gen. Laws 1, 15 (codified at TEX. LAB.CODE § 406.121(2)).

---

6. The commonly understood difference between general contractors and premises owners may explain why Entergy failed to raise the statutory-employer defense until nearly two years after the suit was initially filed. Even then, the defense was the last of the ten defenses Entergy raised, after contributory negligence, failure to mitigate damages, and several others.

## B. The Statutory Revision

Significantly, the Legislature used almost identical "undertake to procure" language in the prior version of the statute when conferring statutory-employer status on prime contractors who provided workers' compensation coverage to their subcontractors. Act of May 28, 1983, 68th Leg., R. S., ch. 950, § 1, 1983 Tex. Gen. Laws 5210, 5210, *amended by* Act of Dec. 12, 1989, 71st Leg., 2d C.S., ch. 1, § 3.05(a)(5), 1989 Tex. Gen. Laws 1, 15. The prior statute equated the term "prime contractor" with "general contractor," and defined it to mean "the person who has undertaken to procure the performance of work or services." *Id.* The definition of "subcontractor" in the same legislation left no doubt that the language embraced the commonly understood meaning of a contractor as one who has agreed with another to perform work or services in exchange for compensation. "[S]ub-contractor" was defined as a person who has contracted to perform all or part of work or services that "a prime contractor *has contracted with another party to perform.*" *Id.* (emphasis added). Despite the clarity of that language, the Court and Justice Hecht conclude that the 1983 general-contractor definition could be read to encompass premises owners who have not contracted with other persons to perform work. Apparently, they believe only third-party language within the general-contractor definition itself would demonstrate legislative intent to exclude premises owners.

Justice Willett, and the Court to some extent, make much of the Legislature's omission in 1989 of the third-party language, concluding that the Legislature meant to abolish the " 'upstream contract' condition." It is hard to fathom that such a sweeping and deliberate change in the law would be so subtly effected. But if

that had been the Legislature's intent, it would not have substituted "undertaken to perform" language that had long been recognized in the general-contractor definition as imposing a third-party obligation. The Legislature's use of the same language in the old and new general-contractor definitions strongly indicates it intended the same meaning in each version.

Reliance on omission of the third-party language in the subcontractor definition is misplaced for yet another reason. It is true that the Legislature is presumed to act with knowledge of existing laws, *Acker v. Tex. Water Comm'n,* 790 S.W.2d 299, 301 (Tex.1990), and that deletions in existing laws are presumed to be intentional. *In re Ament,* 890 S.W.2d 39, 42 (Tex.1994). But the 321–page workers' compensation bill enacted in 1989 did not merely amend prior laws, it massively overhauled the entire workers' compensation scheme. While portions of the bill amending the Insurance Code, the Government Code, and other measures related to workers' compensation indicated deletions with bracketed strikeouts, articles 1 through 11 of the bill comprising the Workers' Compensation Act itself contained no such indications of omissions. *See* Tex. S.B. 1, art. 1–11, 71st Leg., 2d C.S. (1989) (codified as amended at TEX. LAB. CODE, Title 5, Subtitle A); *see also Tex. Legislative Council Drafting Manual* 35–36 (2008), *available at* http://www.tlc.state.tx.us/legal/dm/draftingmanual.pdf. Thus, omission of the third-party language from the subcontractor definition does not merit the weight the Court and Justice Willett afford it. Because "contract[ing] with another party" is inherent in the nature of general contractors and analogous terms, and because the concept had been subsumed in the definition of "prime contractor" and "general contractor" as "the person who has undertaken to procure the performance of work or services," the third-party

language in the subcontractor definition was most likely not included in the new Act to conform the two definitions.

Giving virtually no effect to the Legislature's restriction of "general contractor" to terms analogous to "principal contractor," "original contractor," and "prime contractor," the Court and Justice Willett attach great significance to the sentence excluding motor carriers that provide transportation services through the use of owner-operators. But when that exclusion is viewed in the context of the entire statutory scheme and other law applicable to motor carriers, the reason for the exclusion becomes clear: in the 1989 rewrite of the Act, the Legislature made some, but not all, of section 406.123 applicable to motor carriers. Like general contractors and subcontractors, motor carriers and owner-operators (which are deemed independent contractors under section 406.121(4)) may enter into an agreement under which the motor carrier provides workers' compensation coverage to an owner-operator and its employees. TEX. LAB.CODE § 406.123(c). And like a general contractor, a motor carrier that provides workers' compensation coverage to its independent contractor may deduct the premium from the contract price without incurring penalties under section 415.006 of the Act. *Id.* § 406.123(d). But unlike general contractors, a motor carrier that provides coverage to its independent-contractor owner-operator does not become the statutory employer of the owner-operator or the owner-operator's employees—there is no provision equivalent to section 406.123(d) that applies to motor carriers. This differing treatment of motor carriers is consistent with section 5.001(a)(2) of the Transportation Code, which restricts the ability of common carriers to limit their common law liability. It may also be attributable to the heightened standard of care imposed upon common carriers in light of their potential impact on public safety and their highly regulated status. *See Speed Boat Leasing, Inc. v. Elmer,* 124 S.W.3d 210, 212 (Tex.2003); *S. States Transp., Inc. v. State,* 774 S.W.2d 639, 642 (Tex.1989) (GONZALEZ, J., dissenting). One could argue that motor carriers are analogous to general contractors, in that they frequently contract with third parties to provide transportation services and then subcontract with owner-operators to actually perform those services. Thus, the Legislature likely expressly excluded motor carriers from the general-contractor definition to make it clear that, even though they might otherwise fit the general-contractor construct, they are to be treated differently.

### C. Justice Hecht's Policy–Based Interpretation

Noting that a property owner *may* act as its own general contractor, but acknowledging that the term is more generally understood to mean one who contracts with a property owner and then subcontracts parts of the job to others, Justice Hecht concludes that we just can't tell from the statutory language what the Legislature meant. Finding the text elusive, Justice Hecht discerns "policies embedded in the Act" which he believes tip the scales in favor of treating a premises owner as a general contractor. There are several problems with this approach. First, while the definition of a "general contractor" as one who "undertakes to procure the performance of work" may in isolation appear open-ended, the definition's second sentence ties the term to its commonly understood meaning. Second, if indeed the text is ambiguous as Justice Hecht claims, we have clearly said that statutes in derogation of common law rights should not be " 'applied to cases not clearly within [their] purview.' " *See Energy Serv. Co. of Bow-*

*ie, Inc. v. Superior Snubbing Servs., Inc.,* 236 S.W.3d 190, 194 n. 17 (Tex.2007) (quoting *Satterfield v. Satterfield,* 448 S.W.2d 456, 459 (Tex.1969)). And third, the "policies" that Justice Hecht identifies and perceives would be thwarted if premises owners are not treated as general contractors have never been applied in this context and beg a question that is exclusively within the Legislature's realm, not ours.

The first policy that Justice Hecht believes sweeps premises owners into the general-contractor definition is the Act's "decided bias" for coverage. *See Wingfoot Enters. v. Alvarado,* 111 S.W.3d 134, 140 (Tex.2003). But the Act's bias is in favor of employers electing to provide coverage for their employees; we have never read a bias into the Act that would confer its protections on third parties absent clear statutory authorization or any indicia of an employer/employee relationship. The Act's general policy that favors employers covering employees cannot expand the category of persons considered "general contractors" beyond the statutory definition; invoking that policy here is particularly unwarranted when the Legislature could so easily have defined the term as expansively as the Court and Justice Hecht do today.

The second policy Justice Hecht cites is the sham-subcontractor provision. *See* TEX. LAB.CODE § 406.124. If the Act prohibits subscribers from utilizing subcontractors to avoid coverage, he posits, it surely would not discourage coverage by denying subscribers the exclusive-remedy defense. But the sham-contractor provision was never intended to impute coverage to true third parties as Justice Hecht seems to imply; it simply prohibits a person who has workers' compensation coverage from subcontracting the work with the intent and purpose of avoiding liability as an employer. *See id.* In other words, an employer cannot designate its employee a subcontractor in order to avoid paying benefits under the Act. No one claims that IMC was hired by Entergy as a sham to avoid paying its own employees workers compensation benefits; the provision is simply irrelevant to analysis of the general-contractor definition.

Justice Hecht next charges that my reading of the statute would have "perverse" results because the contractual indemnity allowed under section 417.004 and provided for in Entergy's contract with IMC would permit Summers to recover common law damages from Entergy, which Entergy could in turn recoup from IMC. Justice Hecht suggests that in such a scenario, "the workers' compensation system provides nothing to any employer." Of course the pre–1989 Act, at least according to my reading (and that of the litigants, amici and Justice Willett), had the same effect, which is a policy choice the Legislature made. The question is whether in 1989 the Legislature intended to change that policy. In addition, several factors undermine Justice Hecht's point. One, while Entergy paid IMC's premiums for Summers' benefits under its owner-provided insurance plan (OPIP), that cost was deducted from the contract price paid to IMC, so Entergy effectively paid nothing for the additional protection Justice Hecht's reading would afford Entergy. Two, owners receive significant economic benefits from OPIPs like Entergy's apart from tort immunity. OPIPs allow owners to secure coverage for all their contractors at a lower overall price than the cost of workers' compensation insurance that subcontractors would normally incorporate into their contract prices, thereby lowering owners' overall costs. Howrey LLP, *Owner Controlled Insurance Programs (OCIPs): Why Owners Like Them and Why Contractors May Not,* CONSTRUCTION WEBLINKS, July 14, 2003, http://www.

constructionwebli nks.com/Resources/Industry _Reports _Newsletters/July _14_ 2003/ocip.htm. In turn, the cost of the premium deducted from IMC's contract price was likely lower than the premium IMC would have otherwise paid. Consequently, both Entergy and IMC benefitted from the insurance arrangement in this instance irrespective of tort immunity. Three, that indemnity agreements like that between Entergy and IMC are widespread in the industry is some indication that premises owners do not perceive the Act's statutory-employer provision to protect them from common law claims, else there would be no need for such agreements. And four, any tort damages that Summers might recover would likely be paid from the commercial general liability policy that Entergy required IMC to obtain as a condition under the parties' contract, and the workers' compensation carrier would be subrogated to Summers' recovery under section 417.001 of the Act. The "perverse result" that Justice Hecht envisions simply does not exist.

The fourth policy reason Justice Hecht cites is that the Act was intended to be comprehensive. But again, it can only be comprehensive to the extent that the Legislature intended, and there is nothing in the 1989 revision that would indicate the Legislature's intent suddenly changed. Underlying Justice Hecht's analysis is an apparent assumption that Summers might recover a windfall against Entergy on his common law claims. But if Entergy is not Summers' employer under the Act, it retains the full panoply of defenses available to it under the common law, and Summers shoulders the burden of establishing the company's negligence with the consequent uncertainties of litigation. Should Summers prevail on his common law claims, which is far from certain, he would forfeit any benefits that he has received under the Act. Irrespective of the workers' compensation system's relative merits, which is not ours to decide, it has operated this way at least until the statutory revision in 1989; there is nothing to indicate the Legislature's revision was intended to effect a change.

### D. Statutory Construction Principles

As I read the statutory language, it seems clear that the Legislature did not intend to transform premises owners who contract for third-party services into general contractors entitled to assert the Act's exclusive-remedy defense. But even if the language were less than clear, well-established statutory construction principles lead to the same conclusion. In a decision issued a week before the Court's original opinion in this case, we considered whether an indemnification agreement between a subscribing employer and another party could be enforced by that party's contractor even though the contractor had not executed the agreement. *Superior Snubbing*, 236 S.W.3d 190. The statute had formerly required only that such an agreement be " 'executed by the subscriber' " to be enforceable, but in 1989 the Legislature changed the statutory language to require a written agreement " 'executed ... with the third party.' " *Id.* at 191 (quoting Tex. Lab.Code § 417.004). Although the revision appeared to require the signature of both parties, we concluded that the Legislature intended no change in the law and that the nonsignatory contractor could seek indemnification as an intended beneficiary of the agreement. *Id.* at 195. In concluding that the Legislature intended no substantive change in the law, despite the change in the statute's language, we relied largely on two statutory construction principles. First, we noted that the common law allows the intended beneficiary of a contract to enforce it, and that statutes in derogation of common law

rights " 'will not be extended beyond [their] plain meaning or applied to cases not clearly within [their] purview.' " *Id.* at 194 n. 17 (quoting *Satterfield*, 448 S.W.2d at 459). Second, we applied the Legislature's directive that in interpreting a statute, courts must " 'consider at all times the old law, the evil, and the remedy.' " *Id.* (quoting TEX. GOV'T CODE § 312.005). Because we could identify no practical motivation for a change, or any extra-textual indication that the Legislature's amendment of the statute was intended to be substantive, we concluded that the third-party beneficiary could seek indemnity. *Id.* at 195.

The application of those same principles in this case demonstrates that the Legislature did not intend to expand the class of contractors entitled to claim statutory-employer status to include premises owners when it rewrote the Act in 1989. Nothing in the Act's legislative history suggests that the Legislature perceived an "evil" in the then-existing requirement that a person must have contracted to perform services for another to be a general or prime contractor. *See* Joint Select Committee on Workers' Compensation Insurance, *A Report to the 71st Legislature* (1988); *Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 512–13 (Tex.1995) (discussing report). And to the extent the statute's language does not plainly entitle premises owners to assume statutory-employer status under these circumstances, *Superior Snubbing* counsels against that construction, as it would be in derogation of Summers' common law rights. 236 S.W.3d at

194 n. 17; *see also Kroger Co. v. Keng*, 23 S.W.3d 347, 349 (Tex.2000) ("[I]t would be injudicious to construe the statute in a manner that supplies by implication restrictions on an employee's rights that are not found in section 406.033's plain language.") (citing *Miears v. Indus. Accident Bd.*, 149 Tex. 270, 232 S.W.2d 671, 675 (1950)).

The Court may perceive that it has managed to blur the inconsistency between its decision today and *Superior Snubbing* by proclaiming that the law has remained unchanged since 1917. 282 S.W.3d at 490. But its own analysis shows how hollow that statement is. The Court acknowledges that an entirely new provision was introduced in 1983, and then amended in 1989. And the Court attaches some significance to the omission of the phrase "with another party" from the subcontractor definition in 1989. 282 S.W.3d at 473. In *Superior Snubbing*, the Court concluded that the Legislature's *insertion* of a phrase failed to demonstrate legislative intent to change the law absent a showing of any specific motivation. Here, the record is similarly devoid of any showing of an "evil" in need of remedy, yet the Court concludes that the *omission* of the "with another party" language effected a sweeping change in the law.

Justice Hecht recognizes the tension between today's decision and *Superior Snubbing*, but brushes it aside because "it has never been clear when a person is considered the statutory employer of a subcontractor or his employees...." [7] He reaches

---

7. The sham contractor provision, now codified as section 406.124 of the Labor Code, the only source of statutory-employer status prior to 1983, appears to have been the subject of only eight cases since its enactment in 1917. *See Hatfield v. Anthony Forest Prods. Co.*, 642 F.2d 175 (5th Cir.1981); *Turnbough v. United Pac. Ins. Co.*, 666 S.W.2d 489 (Tex.1984);

*All–Tex Roofing, Inc. v. Greenwood Ins. Group, Inc.*, 73 S.W.3d 412 (Tex.App.-Houston [1st Dist.] 2002, pet. denied); *Commercial Standard Ins. Co. v. White*, 423 S.W.2d 427 (Tex. Civ.App.-Amarillo 1967, writ ref'd n.r.e.); *Houston Fire & Cas. Ins. Co. v. Farm Air Serv., Inc.*, 325 S.W.2d 860 (Tex.Civ.App.-Austin 1959, writ ref'd n.r.e.); *Tex. Employers' Ins.*

that conclusion by focusing on a series of failed bills—all of which ultimately made clear that a general or prime contractor is someone who has agreed to perform work for a third party—and the fact that the 1983 legislative forerunner to the sections at issue today originated in a bill that would have eliminated the sham-subcontractor provision of the Act. Following this circuitous route, Justice Hecht concludes that "the definition of 'prime contractor' finally enacted could reasonably be read to include a premises owner acting as his own general contractor." 282 S.W.3d at 460. That view (voiced by none of the litigants or amici) is simply contrary to the statute's terms; before 1989, the subcontractor definition made it unmistakably clear that a general contractor was someone who had "contracted with another party to perform work." Act of May 28, 1983, 68th Leg., R.S., ch. 950, § 1, 1983 Tex. Gen. Laws 5210, 5210, *amended by* Act of Dec. 12, 1989, 71st Leg., 2d C. S., ch. 1, § 3.05(a)(5), 1989 Tex. Gen. Laws 1, 15. Moreover, to the extent Justice Hecht's interpretation of the Act is informed bills that were never adopted by both houses of the Legislature, it is worth noting that the House committee substitute for Senate Bill 1, the source of sections 406.121 and 406.123, would have specifically allowed premises owners to secure statutory-employer status, but that version of the bill was rejected in its entirety by the Senate. *See* H.J. of Tex., 71st Leg., 1st C.S. 76 (1989). In any event, I agree with Justice Willett that failed legislation is an unsound guide to legislative intent.

The Court's conclusion that premises owners are subsumed within the general-contractor definition is also inconsistent with another statutory construction princi-

ple we have frequently employed. Just four months ago, we analyzed section 101.022(b) of the Texas Civil Practice and Remedies Code to determine whether loose gravel on a road amounted to a special defect. *Tex. Dep't of Transp. v. York*, 2008 WL 5105254 (Tex.2008). The statute we evaluated imposed a heightened duty on governmental units to warn of special defects "such as excavations or obstructions on highways, roads, or streets" of which they should have been aware. TEX. CIV. PRAC. & REM.CODE § 101.022(b). We explained that while the statute did not define "special defect," it did give examples:

> Thus, "[u]nder the ejusdem generis rule, we are to construe 'special defect' to include those defects of the same kind or class as [excavations or obstructions]." ... While these specific examples "are not exclusive and do not exhaust the class," the central inquiry is whether the condition is of the same kind or falls within the same class as an excavation or obstruction.

*York*. Because loose gravel did not share the characteristics of an obstruction or excavation, we held that it was not a special defect. *Id.* The application of York's principles in this case demonstrates that the Legislature did not intend to include premises owners within the Act's general-contractor definition. As already explained, a premises owner who is not performing work for another does not share the characteristics of a general contractor, a principal contractor, an original contractor, or a prime contractor. *See also U.S. Fid. & Guar. Co. v. Goudeau*, 272 S.W.3d 603, 606 (Tex.2008) ("Under the traditional canon of construction noscitur a sociis ('a word is known by the company it keeps'),

each of the words here must be construed in context.").

In support of its construction, the Court posits two workers injured in the same industrial accident receiving different compensation. The Court apparently considers it anomalous that a worker employed by the premises owner working side-by-side with a subcontractor's employee might be limited to workers' compensation benefits, while another employed by an independent contractor would be able to seek the full range of damages under the common law. First, to the extent such an anomaly exists under my reading of the statute, it is the result of policy choices made by the Legislature that long pre-existed the 1989 revision. Moreover, in implying that the result is somehow unfair to the premises owner's injured employee, the Court overlooks the option the Act provides employees of subscribing employers to elect not to be covered by workers' compensation. TEX. LAB.CODE § 406.034. It also overlooks the quid pro quo, being the relinquishment of uncertain common law recovery in exchange for the prompt receipt of defined benefits, that has insulated the Act from constitutional challenge under the Open Courts provision of the Texas Constitution. *Garcia*, 893 S.W.2d at 521.

## II.

Because I do not believe that the Legislature in the 1989 Act intended to change prior law and confer statutory-employers status on premises owners, I respectfully dissent.